## A. L. Carrithers & Son v. City of Louisville.

(Decided May 16, 1933.)

(Rehearing Denied Oct. 31, 1933.)

EUGENE R. ATTKISSON for appellant.

DAVIS W. EDWARDS, WILLIAM T. BASKETT and LABAN H. WESLEY for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Reversing.

The General Assembly of Kentucky at its 1930 session (chapter 86, page 253, sec. 11, Acts 1930, section 3037h-121, Ky. Stats.) granted power to the city of Louisville to zone the city "for the purpose of promoting health, safety, morals, or the general welfare of the community," with the power to regulate the height, stories, size of a building, or other structures and the percentage of the lot that may be occupied, and to regulate the use of buildings, structures, and land, for trade, industry, residences, or other purposes. The city was zoned by an appropriate ordinance.

Section 10 of the ordinance contains a nonconforming use provision in this language:

"The lawful use of the building existing at the time of the passage of this ordinance may be continued, although such use does not conform with the provisions hereof, and such use may be extended throughout the building, provided no structural alterations, except those required by law or ordinance, are made herein."

Section 25 in part reads:

"In interpreting and applying the provisions of this ordinance, they shall be held to be the minimum requirements for the promotion of the public safety, health, convenience, comfort, prosperity or general welfare."

The trial court in a written opinion has aptly stated the pertinent facts, thus:

"Plaintiff, A. L. Carrithers & Son a corporation, conducts a milk plant and products business at 221-225 Woodbine Avenue, in the city of Louis-

ville The business was begun by the elder Carrithers in a small way in 1909, when, as some of the witnesses said, he had one or two cows in his backyard and sold milk to his neighbors. The business gradually increased, and in order to take care of its expansion, Carrithers bought a vacant lot, adjoining his residence, and used the rear of both lots for his business. By various additions and alterations he developed the present plant, which extends 83 feet across the rear of both lots and about 44 feet southwardly from the alley back of the property. The area used for business purposes is little more than a third of the whole area of the two lots. The plant includes a delivery platform and receiving room, a boiler room, a pasteurizing and bottling room, a cold storage room, a drivers' checking room, a locker room, a bottle and can washing room, a by-products room and two garages. In 1919 the business was incorporated and it now has a trade amounting to $115,000.00 per annum.

"On July 8, 1931, the Board of Aldermen of the city of Louisville, pursuant to the power granted it by an act of the General Assembly of 1930 (Acts of 1930, chapter 86 [Ky. Stats., sec. 3037h-111 et seq.]), adopted a zoning ordinance, by which the city was divided into eleven districts, designated by the letters 'A' to 'K' inclusive, and described as 'One Family Districts,' 'Four family districts', 'Apartment Districts', 'Commercial Districts', 'Business Districts', 'Light Industrial Districts' and 'Heavy Industrial Districts' with certain sub-classifications.

"The act (of 1930) created a Board of Adjustment and Appeals, which was to have power inter alia to make 'such variations as will prevent unwarranted hardship or injustice and at the same time most nearly accomplish the purpose and intent of the regulations of the zoning plan.' Chapter 86, sec. 12 (Ky. Stat., sec. 3037h-122)."

In May 1931 the Board of Aldermen of the city adopted an ordinance regulating the business of milk producers, and the selling of milk products. A. L. Carrithers & Son was engaged at its plant in the business of producing and selling grade "A" milk, butter,

cream and buttermilk. The chief inspector of the health department of the city in the exercise of the power conferred on him by the milk ordinance, inspected its plant and premises.

The result of his investigation was that he required A. L. Carrithers & Son either to stop manufacturing butter or enlarge its plant, or erect additional rooms, or if he did not stop making butter, it would not receive a grade "A" rating. It was his conclusion that by the adding of a can-washing and by-products rooms, it could continue its business with grade "A" rating. To comply with this and the requirements of the ordinance regulating the conduct of the business and the operation of its plant, it made application to the city's inspector of buildings for a permit to extend certain walls of its building and partition a space 27x34 feet, so as to make a can-washing and by-products rooms and a small office, which he refused to grant.

On July 23, 1931, this inpector informed the board of adjustment and appeals "that he refused the application of A. L. Carrithers & Son a permit to structurally alter and add to their plant because it would be a violation of Sec. 4 of the zoning ordinance." Sec. 4 alluded to in the report of the inspector of buildings as it relates to the subject matter under consideration reads:

"In the B-Four family district no building or land shall be used; no building shall be hereafter erected or structurally altered unless otherwise provided in this ordinance."

Other than this formal report, the record is silent as to his participation in the controversy.

An appeal was taken by A. L. Carrithers & Son from the action of the inspector of buildings to the board of adjustment and appeals. Section 3037h-122, Ky. Statutes. It approved his action. Within thirty days after this action of the board of adjustment and appeals, A. L. Carrithers & Son presented its petition duly verified, to the Jefferson circuit court setting forth the grounds, as it conceived them to be, of the unlawful, unreasonable, and arbitrary action of the board of adjustment and appeals and inspector of buildings. Section 3037h-122, Ky. Stats. The circuit court on the evidence presented approved the action of the board of adjustment and appeals.

A permit was denied by the board of adjustment and appeals on the grounds it (a) materially increased the size of the building; (b) indefinitely prolonged the life of a non-conforming use, and (c) was contrary to the purpose and intent of the zoning ordinance. It was attempted to be shown in the circuit court, and is here argued, that "the operation of this plant is accompanied by noises that prevent the neighbors from sleeping from 2 o'clock in the morning; these noises are caused by iron wheels, horse-drawn vehicles and trucks coming and going, and by cans, crates and bottles being handled. At times the ice plant runs all night with a noise that keeps those in the vicinity awake, and occasionally the machinery is started during the night, accompanied by noises which are very objectionable and which disturb the peace and rest of the community. The smoke from the factory, if you may so call it, is so great that ome of the people in the neighborhood cannot allow their laundry to hang in the yards, or to even leave their windows open. In one case it destroyed entirely the comfort of a young man, who, by reason of injuries in the war, became tubercular, and he could not rest even in the daytime in his dwelling near this place. It also caused rats to infest the neighborhood. The alleys are blocked so that the neighbors at times cannot get in or out. The street in front of the plant is congested and made dangerous by the trucks and wagons going in and out, particularly for the school children, and people going to and from church. It is well known that the business of a plant or factory in residence neighborhoods attracts people who would otherwise have no business in the district, thus furnishing an excuse for the coming about of persons criminally inclined."

There is evidence authorizing these statements. Contrary evidence, equal in kind if not in credibility and quality, was adduced in behalf of A. L. Carrithers & Son. The evidence as to the resulting inconveniences and noises incident to the use of the building and land upon which it is situated as it existed at the time of the adoption of the zoning ordinance, and since, is wholly immaterial, and sheds no light on the decisive issue. If this were an action to require the cessation of a prohibited business or a prosecution to abate a nuisance, such evidence would be material. The enforce-

ment of the provisions of a zoning ordinance dealing with structural alterations may not be resorted to to accomplish the purpose of such an action or prosecution. There is no evidence showing, or tending to show, that the alteration of the plant, as proposed and requested by the application for the permit, will increase, or at all affect, or create, any additional noise, smoke, or other inconveniences. The city cites numerous cases involving zoning ordinances, including the use of buildings and lands in zoning districts. It especially presents Standard Oil Co. v. City of Bowling Green, 244 Ky. 362, 50 S. W. (2d) 960; Village of Euclid v. Ambler Realty Co., 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016; State ex rel. Carter v. Harper, 182 Wis. 148, 196 N. W. 451, 457, 33 A. L. R. 269; Hadacheck v. Sebastian, 239 U. S. 394, 36 S. Ct. 143, 60 L. Ed. 348, Ann. Cas. 1917B, 927; State ex rel. City Ice & Fuel Co. v. Stegner, 120 Ohio St. 418, 166 N. E. 226, 64 A. L. R. 916. The questions presented for determination in the present case are not considered or determined in any of those cases. Nor were the zoning ordinances involved in them similar in terms or phraseology to the one here presented. Standard Oil Co. v. City of Bowling Green involved the constitutionality of a zoning ordinance in respect to a gasoline station erected six years before its passage. It was held that the undisputed facts showed that the general welfare had not been adversely affected by the use of the lot for such station, and that a gasoline and oil station was not a nuisance, though it might become such because of inappropriate location.

In Euclid v. Ambler Realty Co. the zoning ordinance included a tract of vacant land which had been held for years for the purpose of selling and developing, not for industrial uses. An injunction was sought to prevent its threatened enforcement. It was held constitutional, and that, the legislative classification for zoning purposes being fairly adaptable, the legislative judgment must be allowed to control.

In State ex rel. Carter v. Harper, at the time the zoning ordinance was adopted by the city, the property was within a residential district. It did not conform to the use permitted by the ordinance in the residential districts. It provided that no building within the residental district devoted to a nonconforming use should

be enlarged, unless the use was changed to a conforming use. At the time of its adoption, the property was used in the business of wholesaling and retailing milk and dairy products in the city. The business had outgrown the capacity of the plant to such an extent that it became impossible for the owner to conduct it in the building in accordance with the health regulations. He made application to the inspector of buildings of the city for a permit to erect an addition to its plant. It was denied for the reason that the proposed addition was in violation of the provisions of the zoning ordinance. The owner applied to the court for relief against the ordinance, charging that it was unreasonable, in that it prohibited him from enlarging the business to which its property was devoted prior to the passage of the ordinance. The conclusion of the court was expressed in this language:

"It is our conclusion that the ordinance is, in the respects here considered, a reasonable, valid, and constitutional enactment. * * * So far as the ordinance affects the rights of appellant, it fully authorizes the denial of a building permit the issuance of which he seeks to coerce."

In Hadacheck v. Sebastian, an ordinance of the city prohibited the manufacture of brick within a certain specified section of the city. It was held that it was within the power of the city to adopt and enforce it against the owner of the property affected by it.

In State ex rel. v. Stegner a zoning ordinance limited subsequent additions to business buildings existing in the residential districts at the time of the enactment of the ordinance. A permit was sought by the owners of the building used for storing ice to enlarge it to be used for manufacturing ice by electric machinery process. The permit was refused by the authorities of the city, and the court approved their action on the ground the structural change in the building was not permissible under the zoning ordinance.

The learned circuit judge in his written opinion herein quotes Euclid v. Ambler Realty Co. and State ex rel. Carter v. Harper and Hadacheck v. Sebastian as authority for his conclusion. Sections 10 and 25 of the ordinance involved in this case, and the facts presented, clearly distinguish it from those and other cases of like import which might be cited.

To decide the real issue here presented, it is not necessary to determine whether the preponderance of the evidence bearing on the issue presented in the briefs of the city, which is not in fact actually involved, and to which the major portion of the evidence in behalf of the city was directed, is in favor of or against the contention of either A. L. Carrithers & Son or the city. Neither the constitutionality, the reasonableness of the zoning ordinance, nor the past or present inconveniences arising from the presence of the plant and its operation is the real, determinant issue. The correct, the fair, and the reasonable interpretation and application of the zoning ordinance and its enforcement, conjointly, with the ordinance regulating the retailing of milk, cream, butter, and buttermilk, within the restricted area, in which the plant of A. L. Carrithers & Son is located, determine this case. It was engaged in this business at its plant at the time of the passage of both ordinances, selling grade "A" products. Section 10 expressly authorizes the continuation of the lawful use of the land, buildings, and plant, existing at the time of the passage of the ordinance, and that "such use may extend throughout the building, provided no structural alterations, except those required by law or ordinance are made therein." Section 25 provides that all of the provisions of the ordinance shall be held to be "the minimum requirements for the promotion of public safety, health, convenience, comfort, prosperity or general welfare." The act of 1930 authorized the making of such variations as will prevent unwarranted hardship or injustice, and at the same time accomplish the purpose and intent of the regulations of the zoning plan. It is not disputed that to fulfill the requirements of the ordinance regulating the sale of milk and its by-products, and of the chief health inspector of the health department, A. L. Carrithers & Son made application for the permit, and that a compliance therewith was its imperative duty. Such action was not in any sense voluntary on its part. The extending the walls of the building so as to enclose space for the relocating the can-washing and by-products rooms is not a vital and substantial change of the building in its characteristic or of the fundamental purpose of its creation, nor is it a change of such a nature as materially affects the realty itself, or its use, or the health, morals, or general welfare of the zoned district. Plaza

Amusement Co. v. Rothenberg, 159 Miss. 800, 131 So. 350; Pross v Excelsior Cleaning & Dyeing Co., 110 Misc 195, 179 N. Y. S. 176 The application for the permit requests no more than a structural alteration and not a structural change within the meaning of these terms. City of Earle v. Shackleford, 177 Ark. 291, 6 S. W. (2d) 294. "Structural alterations" intended to be prohibited by the zoning ordinance are the changing an old building in such a way as to convert it into a new or substantially different structure. Even though the "structural alterations" necessary or requisite to house the can-washing and by-products rooms be regarded as prohibited by the term "structurally altered" as it is used in section 4, the language of section 10 is sufficient to authorize it. The language of section 10 authorizes "structural alterations" where "required by law or ordinance." The appplication for the permit sought is not exclusively controlled by section 4. Such construction, in effect, eliminates from section 10 a portion of the language therein; i. e., "structural alterations except those required by law or ordinance." The building inspector's report shows that he disregarded this phrase in section 10, and was controlled solely by section 4. The board of adjustment and appeals seemingly approved his action. The decree of the circuit court sustained its conclusions. The building inspector and the board of adjustment and appeals were without right to disregard entirely the language of section 10. The ordinance regulating the retailing of milk and the operation of such plants and the zoning ordinance may not be integrated and conjunctively enforced so that the one may require "structural alterations" to fulfill its requirements, and the other to prohibit a compliance therewith, and thus destroy or compel the removal from the zoned district the use of the property permitted to be conducted by the zoning ordinance. This is in effect the sequence of the city's so enforcing the two ordinances as far as they affect A. L. Carrithers & Son. The change in the plant required by the milk ordinance must be regarded as required by law or ordinance within the meaning of those terms as they are used in section 10. It does not appear that, previous to the imparting of the information to A. L. Carrithers & Son by the chief inspector of the city health department, the can-washing and by-products equipment would have to be installed

in other rooms, A. L. Carrithers & Son had equipped its plant with an office. Therefore, as to the request for a permit to extend its plant to include office space, the granting of it for this purpose was, and is, within the inhibition of the zoning ordinance; no office having been heretofore used in connection with the plant. The granting or refusing of the permit therefor was and is within the sound discretion of the board of adjustment and appeals. The milk inspector did not include in his requirements the furnishing and equipping of an office.

This action was filed on the 18th day of November, 1931. Within a week thereafter, on November 25th, Jennings, the milk inspector, submitted the drawing of a new plan for the operation of the plant of A. L. Carrithers & Son. It required the elimination of the garage used in connection with, and as a part of, the plant, and, in addition to this, it required the use of a portion of the residence of A. L. Carrithers for the purpose of the plant; also the use of the alley and a storage tank on a wagon in the alley, for the purpose of taking care of the by-products. The submission of this new plan establishes and substantiates both the necessity and the justice of the request for the permit, in so far as it contains can-washing and by-products rooms. The chief reasons assigned for denying the permit by the agents of the city were, the exercising of it "would prolong the life of the plant indefinitely, materially increase the size of the building and would be contrary to the purpose and intent of the zoning act." Such reasons are unsound and untenable when it is borne in mind that the making of the alteration respecting the can-washing and by-products rooms is simply a compliance with the requirements of the ordinance regulating the retailing and handling of milk at its plant in accordance with the demands of the chief inspector of the health department. The purpose thereof is to protect the health of the users of milk. To approve the "new plan" is equivalent to compelling A. L. Carrithers & Son to discontinue the use of the garage as a part of its plant and converting the residence and alley to a new use, which is as much a violation of the zoning ordinance as will be the use of the space necessary to house and relocate the can-washing and by-products equipments under the permit requested. Evidence was

472

presented by A. L. Carrithers & Son showing that other milk concerns had been granted permits by the authorities of the city which resulted in the "structural alterations" of their plants. It is argued that these companies, engaged in like business, to which permits had been granted, in form and substance, similar to that requested by A. L. Carrithers & Son, were located in zoned districts entirely different in environments to that in which its plant is located. Accepting this as the correct view, the granting of such other permits is a contemporaneous construction by the city authorities of the term "structural alterations" as it is used in the zoning ordinance, and, if the granting of them be considered in this case, for any purpose whatsoever, it is proper to consider it only for the purpose of defining the words "structural alterations" as they were interpreted by the city authorities whose duty it is to enforce the ordinances. It was the duty of the board of adjustment and appeals to grant in part, or refuse in part or in whole, the permit to A. L. Carrithers & Son, according to the provisions of the zoning ordinance applicable to the particular facts.

Viewing the ordinance and the facts as presented, the board of adjustment and appeals improperly refused to grant the permit in so far as it sought to relocate and rearrange the can-washing and by-products rooms, in order to comply with the ordinance regulating the sale of milk products and the operation of its plant. The decree of the circuit court not being in harmony with our views, it is reversed, with directions to remand the application to the board of adjustment and appeals, with directions to it to grant the permit in so far as it applies to the can-washing and by-products departments, and, in its discretion, grant or refuse it so far as it authorizes the office space, and for proceedings consistent with this opinion.