Yocom et al's. Appeal.

Argued May 7, 1940.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADT-
FELD, PARKER, RHODES and HIRT, JJ.

*Thomas L. Kane,* for appellants.

*Thomas N. Griggs,* with him *Frederic G. Weir,* Assistant City Solicitor, for appellees.

OPINION BY RHODES, J., October 7, 1940:

Appellants are owners of two vacant lots situated on the southeasterly corner of the intersection of Fifth Avenue and Craig Street, South, in the City of Pittsburgh. Under the provisions of the zoning ordinance of the city, approved August 9, 1923, and thereafter amended, this area of the city is classified as an "A" residence district, the uses permitted for such classification not including the operation of a public automobile parking lot, to which appellants wish to devote this land.

Article 5, §18, of the ordinance provides, inter alia: "(a) The lawful use of land existing at the time of the adoption of this ordinance, although such use does not conform to the provisions hereof, may be continued, but if such nonconforming use is discontinued, any future use of said land shall be in conformity with the provisions of this ordinance."

Article 11, §46, reads as follows: "Section 46. Occupancy Permits. No building structure or land shall be used or changed in use until a certificate of occupancy and compliance shall have been issued by the Superintendent of the Bureau of Building Inspection stating that the building, structure or land and the proposed use of the same complies with the provisions of this ordinance. A like certificate shall be issued for the purpose of maintaining, renewing, changing or extending a nonconforming use."

On application the Bureau of Building Inspection re-

fused to issue a certificate to appellants. They appealed to the Board of Adjustment pursuant to the provisions of the Act of March 31, 1927, P. L. 98, 53 PS §9183 et seq. After certain intermediate proceedings, which are immaterial to the disposition of the present case, the board heard testimony on the issue; and the board held that the use of appellants' property as a public automobile parking lot was not a nonconforming use antedating the passage of the ordinance, because it considered the parking of automobiles, engaged in at the time of the enactment of the ordinance, merely incidental and accessory to use of the residential structure then standing on the property as a rooming house, and limited to the rear of the premises, not having extended to the Fifth Avenue frontage prior to the demolition of the dwelling in 1931. Accordingly, the board dismissed the appeal from the refusal of the certificate.

Appellants then filed their petition in the court of common pleas, and the Pittsburgh Fairfax Corporation, owner of a large apartment house immediately to the east of appellants' property, was allowed to intervene as a party defendant. The hearing judge approved the board's material findings, and held that the use of appellants' property previous to the passage of the ordinance was incidental to the operation of the rooming house, that the use as a public automobile parking lot was not a nonconforming use which preceded the ordinance, and that the board had not abused its discretion in denying the appeal. The court in banc dismissed the exceptions filed to these findings and conclusions, as well as to the court's failure to grant appellants' requests for other findings of fact.

The assignments of error relate to the dismissal of all but two of the exceptions.

The fourth to the eleventh assignments, inclusive, complain of the refusal of the court below to make findings of fact which, if made, would not appear to

168

affect the determination of the ultimate questions involved, and may therefore be dismissed as immaterial. It is not essential that findings be made covering every uncontroverted fact when they would not go to the fundamental question if made.

Appellants testified, without material contradiction, as to the physical description of the property, and the use made of it during the years immediately before and after the passage of the ordinance. The premises have a width of 100 feet on Fifth Avenue, and a depth of 160 feet on Craig Street to Henry Street. A twelve-room dwelling facing Fifth Avenue, and set back not more than 20 feet, stood on the property in 1921, together with an outbuilding, described as a wash house, 9 by 18 feet, on the easterly line facing Craig Street. The wash house was demolished some time after 1923, and the dwelling in 1931. At the time of the adoption of the zoning ordinance on August 9, 1923, title to the premises was in Elizabeth W. Sterling, trustee, mother of appellants. In 1929 she conveyed it to one Merkle, and received a purchase money mortgage. As a result of foreclosure proceedings she reacquired it in 1931, and thereafter the dwelling was torn down. Upon her death in 1936 title to the premises vested in appellants. In 1921 appellants' mother began to rent rooms to lodgers, some of whom owned automobiles, and offered to rent space in the yard in which to park their cars. At the beginning of 1922 an average number of cars parked in the yard was four. The owner of the rooming house next door very soon asked appellants' mother to rent parking space to her roomers also, which was arranged, resulting in an increase of two to eight cars. Before 1923 there was additional parking on some Saturday mornings by transient patrons of the neighboring Duquesne Garden ice-skating facilities. The average daily number of cars parked in the yard adjoining the dwelling house was five. The principal income of the family

was from the renting of lodgings, and as a general rule the renting of parking space was to the lodgers in the two houses. The rooming-house-parking-space enterprise was suggested to appellants' family by the operation of a similar establishment across the street. It was after the demolition of the dwelling house in 1931 that the entire property was used for parking.

As to use of the Fifth Avenue frontage previous to 1923, the testimony of Jeannette S. Yocom, one of the appellants, was as follows: "Q. Would you say they parked on the Fifth Avenue part of the lot before 1923? A. Well not very often, just once in a while. There was a driveway going on around the house and people would pull up into it because there was a big piece of cement where they parked. ...... Q. Prior to August 8th, 1923 you want to state here for the record that cars were parked on the Fifth Avenue side of the lot? A. Yes, sir. A few cars. Not many but some were parked there. Q. Just casually? A. Not exactly. Whenever we had cars in the back they were allowed to park where they wanted to." For the entire period before the demolition of the house the practice was thus described by Mrs. Yocom: "Q. But prior to the removal of the house in 1929 the parking of cars on the front lot was only occasional? A. Only occasionally when they had the World Series—they were in the front then. We tried to keep the cars in the back of the place. ...... Q. You want to correct your testimony to say the portion on the Fifth Avenue end was just casual parking up until 1931? A. In the front of the place, yes, sir." There was also this testimony by the same witness: "Q. Was there any drive on the property that automobiles could drive around on? A. There was a small drive they could use but it was never used. Q. But some did drive in front of the house? A. Yes, sir. Q. In other words, they drove where it was most convenient to park the cars? A. Yes, sir."

Previous to 1929 the renting of lodgings and parking space was advertised by small signs placed in the windows of the first floor corner room of the house. During the Pittsburgh games of the 1925 World's Series the first large sign advertising parking space was used. Since 1931 signs have been from time to time attached to the trees on the property.

The lots at present appear to lie at a slight elevation from Fifth Avenue, and at somewhat more of an elevation from Craig and Henry Streets in the side and rear, respectively. There is no structure whatever on the site now. The proposed use includes erection of a shelter for the attendants, and of a fence, the installation of lights, the grading of the road to a level with Fifth Avenue and a lessened elevation on the other streets, the use of whitened stones for beautification with white lines dividing various portions of the area for parking, and the adoption of a tagging system for the identification of automobiles.

The real question for determination is whether this use is substantially the same as that obtaining on these premises previous to August 9, 1923, when the zoning ordinance became effective. In other words, did appellants show a nonconforming use as contemplated by the ordinance? The Board of Adjustment and the court below would seem to be entirely justified in concluding from the facts shown that they did not. In *Haller Baking Company's Appeal*, 295 Pa. 257, 260, 145 A. 77, our Supreme Court said this ordinance adopted the intent of section 3 of the Act of March 31, 1927, P. L. 98, 53 PS §9185. In the section referred to, the regulations authorized by that act are to be "designed to lessen congestion in the streets," and "made with reasonable consideration, among other things, to the topography and character of the district with its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the

most appropriate use of land throughout such city."
The Board of Adjustment, in effectuating such a de-
clared intent, properly recognized a wide difference
between the incidental parking of automobiles in con-
nection with the use of the premises as a rooming house,
prior to the adoption of the ordinance in 1923, and the
present and proposed use of all of appellants' land,
including that upon which the buildings formerly stood,
as a public automobile parking lot. Use of premises
primarily for profit for the accommodation of roomers,
bears little, if any, relationship to use of all of the same
land for a commercial parking business. When the
ordinance was adopted there existed on this terraced
land a large dwelling house, behind which automobiles
were parked by a number of persons, resident there or
next door, and more or less frequent transients, but in
front of which automobiles were placed only casually
for the convenience of particular persons, or at times
of overflow from the rear of the premises, and at all
times against an effort by the property owner to confine
them to the rear; at the present time, after removal of
the house and outbuilding and leveling of the terrace,
the entire area up to each of its boundaries is and will
be used for the parking of automobiles in greatly in-
creased numbers with the paraphernalia of advertising
signs, bright lights, noise, and movement which are the
acknowledged attributes of this business in metropolitan
districts. It is true that in *Haller Baking Company's
Appeal,* supra, the Supreme Court used the following
language (p. 261) : "Neither the extent, quantity nor
quality of the use is mentioned, but only that it must
exist. Neither the act, the ordinance nor the law gen-
erally requires the court to speculate as to the number
of acts or business transactions necessary to constitute
an existing use. Under the decision of the court below,
a grocer with his stock of goods in place, who makes
only a few sales a week, would not be in the grocery

business under the imposed limitation." But the Supreme Court there was passing upon the refusal by the Board of Adjustment of a certificate for the continuance of an alleged nonconforming use, a twenty-five horse stable, on the ground that the use existing at the time of enactment of the ordinance had been limited to the stabling of less than four horses. The plain effect of that language, in the light of those facts, is that within the area of the admitted function or purpose of a building or parcel of ground, the extent of its use, short of abandonment, is immaterial. In ordering the restoration or reissue of the certificate, the Supreme Court also said (p. 261): "The expression 'existing use,' though difficult to define, is, as a fact, not difficult of determination. As understood in the ordinance, 'existing use' should mean the utilization of the premises so that they may be known in the neighborhood as being employed for a given purpose, i. e., the conduct of a business. Ordinarily an existing use for business combines two factors: (a) construction or adaptability of a building or room for the purpose, and (b) employment of the building or room or land within the purpose." There was no doubt that the existing use of the structure there in question, by its reputation and design, was as a stable, but application of the same standard of determination to the use existing in 1923 of the premises here in question does not sustain the contention that it is merely continued in the present and proposed use. By design, in 1923, the premises would necessarily be described as a dwelling house, one outbuilding used for a domestic function, washing, and such surrounding vacant ground as was originally thought good for the privacy, pleasure, or convenience of the residents in the house. By design, the surrounding vacant ground was no more adapted for the parking of automobiles than for many other conceivable purposes. It could not reasonably be inferred that, by reputation, the premises were primarily any-

thing but a rooming establishment. Appellants' own evidence was that the use of the yard for the parking of automobiles was the direct outgrowth of the rooming-house business, that the enterprise was suggested by a similar one nearby, that the chief income of the family came from the renting of lodgings, and that in 1931 the dwelling house was torn down not because of any purpose or intention regarding the automobile parking business, but because "it could not possibly be remodeled to make it habitable." (46a)

In *Kiddy's Appeal*, 294 Pa. 209, 143 A. 909, the use of premises existing at the enactment of the same zoning ordinance as is here under consideration was the occasional dumping of building materials on the ground and covering them with a tarpaulin. This was held not to justify the erection of a garage for the storage of such materials. *Lexington v. Bean et al.*, 272 Mass. 547, 172 N. E. 867, is a similar case, and the opinion of the Supreme Judicial Court of Massachusetts contains the following: "The use of the shop by the defendant Perkins for the commercial purpose of repairing motor vehicles for hire is 'substantially different' from a use of it by a person residing on the premises for the purpose of repairing motor vehicles belonging to him as incidental to his trucking and express business and the occasional permissive use of it by persons storing automobiles on the premises. The use now made of the shop was not an 'existing use' of it at the time of the adoption of the by-law, within the meaning of the statute."

We agree with appellee's statement that the evidence clearly shows the great difference between the present and proposed future operation and that existing on appellants' premises at the time the zoning ordinance was adopted. It may be said that all differences are differences of degree, but for purposes of comparison and classification the degree of difference may be so great as to be capable of being called a difference in kind. Such

a difference would appear between the described use of these premises when the ordinance became effective and the present and proposed use for them. We know that many classes of light or part-time employment are capable of being discharged in or about the home; that many functions are capable of being there discharged as subordinate to the chief function of making a home or providing living quarters for transient paying guests, but the adaptability of premises, the dominant function of which is residential, to these servient functions cannot in every case be held to allow the servient use to become dominant.

We do not deem it necessary to consider whether the evidence shows an abandonment of the use of the premises, if any, as a public automobile parking lot between 1929 and 1931, when title was out of appellants' family, as we do not find that prior to the enactment of the zoning ordinance the alleged nonconforming use which the ordinance would have permitted to be continued was established.

The court below properly held that there was no abuse of discretion by the board.

All the assignments of error are overruled.

The order of the court below is affirmed, costs to be paid by appellants.