**ROSENTHAL v. CITY OF DALLAS et al.**

No. 13858.

Court of Civil Appeals of Texas. Dallas.

April 2, 1948.

Rehearing Denied May 7, 1948.

280

Storey, Sanders, Sherrill & Armstrong, of Dallas, for appellant.

H. P. Kucera, City Atty., Carney W. Mimms and Robert L. Lattimore, Assts. City Atty., Thos. G. Murnane and W. R. Hemphill, all of Dallas, for appellees.

YOUNG, Justice.

The suit of City of Dallas charging violation by appellant of zoning ordinances and maintenance of a public and private nuisance on premises located at 3307 Lemmon Avenue, Dallas, was joined in by twenty-six interveners. Upon jury trial and verdict, judgment was rendered of permanent injunction, from which adverse action appeal is taken.

By comprehensive zoning ordinance of September 1929, the particular area had been designated an apartment district wherein commercial use of property was prohibited. Prior thereto, however, an ice factory had long been in operation on lots 12 and 13 of the premises in question, recognized at the time as a nonconforming use. In August 1944, appellant purchased these lots and old ice plant (which had ceased manufacturing ice about 1939 or 1940), obtaining a permit from the office of City Building Inspector for the operation at the same place of a cold storage plant "including meat storage and curing." In March and April 1946, the building inspector took steps looking to a revocation of aforesaid permit (also a second permit issued to appellant January 1946, for a 35' x 85' x 35' x 35' tile garage building on adjoining lots), and the lawsuit centers around this reversal of action by the named official, the City claiming invalidity of permits, necessitating their revocation; appellant pleading, on the other hand, res adjudicata or binding effect of the original permit on all appellees; that his use of the property was merely the continuance of a valid nonconforming use; estoppel to order revocation, in that vested rights had accrued because of valuable improvements made and eighteen months operation of plant with knowledge of City officials and interveners; that the threatened restriction of defendant's property to an' apartment use would constitute a taking without due process of law, etc.; closing with a cross action for injunction as to all adversary parties against further molestation of or interference with his allegedly legal use.

Substance of the jury questions and answers in turn reflect all fact issues raised on behalf of complainants at the trial: (1) The processing of meats at defendant's plant causes offensive and obnoxious odors which spread to neighboring properties; (2) processing of meats at defendant's plant causes contamination of the air in the vicinity to such an extent (a) as to substantially impair the comfortable use and enjoyment of near residential properties by occupants thereof; (b) to materially interfere with the comfortable use and occupancy as a home by a person of ordinary habits, tastes and sensibilities of the property of interveners Misses Hemphill, located at 3226 Lemmon, apartment at 3227 and cottage at 3229 Lemmon Avenue; (c) similarly as to the residence property of interveners Thos. G. Murnane and wife; (3) operation of said plant requires the customary movement of a large number of trucks and vehicles, in and out, creating loud noises audible at the properties of other owners in the vicinity; and incidental to the plant operation is an habitual slamming, in opening and closing of building and vehicle doors; creating noises audible at homes and residences in the vicinity; (4) there was *no* loud talking or noise of grinding sausage at defendant's plant that was audible at neighboring homes and residences; (5) movement of trucks in and out of the plant and their loading and unloading, is accompanied by loud noises, both day and night, audible at homes and residences in the vicinity, of such a nature as materially to interfere with the comfortable use and occupancy as a home by a person of ordinary habits, tastes and sensibilities of the property and residences of interveners Hemphills and Murnanes; (6) raw meat and bones in open trucks are loaded, unloaded and parked at docks of said plant, and visible from residences in the vicinity, including homes of Misses Hemphill and Murnane and wife; (7) but which *do not* interfere with the comfortable use and enjoyment of the homes of said interveners by persons of ordinary sensibilities; (8) likewise the large advertising sign in front of defendant's plant should have no disagreeable effect on a person of ordinary

sensibilities living in the vicinity; (9) operation of defendant's plant causes congestion of vehicular traffic and parking in vicinity of the Lemmon Avenue and Travis intersection; (10) the odors, noises, sights, and congestion of traffic taken together are of such a nature as to materially interfere with the comfortable use and occupancy as a home by a person of ordinary habits, tastes and sensibilities of the properties and residences owned by the Hemphills and Murnanes; (11) the manufacture of ice on lots 12 and 13 had been abandoned prior to the time said lots were acquired by defendant; the word "abandoned" being defined under said issue 33 as "the giving up or relinquishment of a right."

The court's judgment is quite lengthy, but, pursuant to above jury findings and other evidence recited therein as uncontradicted and presenting no issue of fact, defendant Rosenthal was permanently enjoined from using lots 10 to 16 inclusive, block 1/973, City of Dallas, for any purpose other than permitted in an apartment district under zoning laws; from using lots 11, 12 and 13 for any nonconforming commercial use such as ice manufacture or cold storage; in short, being required to tear down and remove all buildings, machinery, equipment and accessories placed on the ground for meat storage and processing; the perpetual restraint extending to all foregoing aspects of nuisance and holding invalid and as violative of City ordinances the two building permits in question.

Material and undisputed facts antecedent to the instant controversy are these: The old ice factory on lots 13 and 12 was adjacent to the highly embanked MK&T right of way and Lemmon Avenue underpass. According to defendant's pleading, before consummating a purchase of the ice factory with its commercial use of more than forty years, he had visited the Dallas City Hall to determine whether the site could be used for his meat processing plant, talking with Assistant Building Inspector Hanson and Assistant City Attorney Dillard. Defendant Rosenthal did not testify at the trial, but, from Hanson's testimony, the application was for a **cold**

storage plant, ancillary to which was the handling of meat along with usual side lines of sausage-making and meat products—no slaughtering of any kind. Mr. Dillard also testified that the discussion involved a cold storage operation with the making or packing of sausages as an accessory, such activity to be substituted for the nonconforming ice factory use; he advising the two (Hanson and Rosenthal) that cold storage was in the same commercial classification as ice manufacturing; that Inspector Hanson should determine as a fact question whether the old factory owners or successors had a valid nonconforming use of the property; if so, they had a right to change over to cold storage with sausage-making as an accessory, in event Hanson should further determine that such was customarily incident to a cold storage plant; also warning against any use such as would create a nuisance or hazard of smoke, "and that was agreed."

Application was filed and permit issued August 7 (property purchased August 21, 1944), the first application signed by Samuels & Company, Packers, reciting in part: "I hereby submit this application for a building permit and certificate of occupancy for (Describe all work to be done, as permit will cover only work applied for) Submit plans in duplicate: Partitions and equipment for cold storage plant * * * Building to be used for (Give all uses to which building is to be put—* * * Cold storage * * * cost of all work to be done under this permit (Include value of all labor and materials) * * * Plumbing & Fixtures $600.00 Wiring & Fixtures $400.00 Total Cost $4,000.00 * * * I have carefully examined and read the completed application and know the same is true and correct and hereby certify and agree that if a permit is issued, all the provisions of the Building Ordinances and State Laws will be complied with whether herein specified or not. * * *." The forthcoming permit carried the same data, along with these provisions in print: "This permit is issued on the basis of information furnished in the application noted by number hereon, and is subject to property restrictions, provisions of the Building Code, Zoning Ordinances and all other governing ordinances which must be complied with, whether or not herein specified. This permit is subject to cancellation upon notice as provided in the Building Code. * * * Certificate of occupancy is required for all buildings or change in use thereof." On back of defendant's Exhibit 13 (receipt for permit fee) was the printed statement: "Important: Read Building Code carefully before starting work. The permit is granted on the express condition that the building or structure shall conform to the Building and Zoning Ordinances of the City of Dallas and to all deed restrictions. * * * If at any time during construction the extent of the work exceeds the cost or value stated on the application for building permit and further if it exceeds that shown on the plans a new permit shall be taken out before proceeding with such extra work. * * *." Several days afterward, according to Inspector Hanson, defendant requested and witness authorized the words "including meat storage and curing" to be inserted in both application and permit.

Defendant then proceeded to make structural alterations and additions to the ice plant building as shown in exhibits brought up in the record; consisting generally of a one-story covered loading dock on the Lemmon Avenue side, a two-story annex on the west, platforms facing south, boiler room and machine shops; installing on the inside meat coolers, pickle cellar (meat curing) and boning room where the processing is done under refrigeration; sausage kitchen, smoking ovens, high pressure cookers or kettles, etc.; total expenditures on the property purchased being stated by defendant in his pleading at approximately $60,000.

In June 1945, defendant purchased lot 10 on Lemmon Avenue and 14, 15 and 16 to the west, fronting on Carlisle Place; and in January 1946, applied for and obtained permit to erect a 35' x 85' x 35' x 35' eight-inch concrete and tile building on the last numbered lots, to be used as "Garage for Samuels & Company Pickup trucks and autos," total cost $1,250, these later papers carrying the same printed

provisions as in the first application and permit already quoted. Testimony on the trial estimated the actual cost of this construction at between $4,000 and $5,000.

In sequence and on the dates shown, the following notices were sent to defendant from the office of Dallas Building Inspector: "March 21, 1946. Subject—Building w/o permit Location—3307 Lemmon Name—Samuels & Co. Address—Same You are hereby notified to stop work on garage on which permit was issued in error and is hereby voided and of no effect. Also stop work on 2-story addition to old building which work is being done without a building permit." "April 1, 1946 * * * Dear Sir: We have checked our records and find that you do not have authority to operate a sausage making establishment in connection with your cold storage plant located at the above address. Some time ago we requested that you make an appeal to the Board of Adjustment for permission to operate this business and we must ask you to discontinue at once the making of sausage until such time as this appeal can be heard." Inspector Cummings, a witness, stated in above connection that the stop-order of March 21 was upon advice of the City Attorney, also pursuant to a number of complaints and some doubt as to the legal status of defendant's plant.

On May 20, 1946, defendant made written request of the Dallas City Council for the rezoning of his property from Apartment D Area to first manufacturing district, describing same as "Fronting northeast along Lemmon Avenue a distance of approximately 250 feet south from the MK&T Railroad r/wy."; stating that he was "now operating a plant at this location, processing meat, and wish to have property zoned for such use." On May 22, the instant suit was filed, attorneys for appellee City agreeing that the pending application to rezone (which was later denied) should be without prejudice to defendant's rights and defenses in the ensuing court litigation. The City pled fraud and misrepresentation relative to defendant's procurement of these building permits, but issues thereon passed out of the case presumptively for lack of evidence.

No appeal to the Board of Adjustment was made by any of the parties hereto from the building inspector's order directing issuance of the original permit; and by his first series of points, appellant argues insufficiency of the petition for injunction as an attempted collateral attack upon the ruling of an administrative officer without following the statutory procedure of Art. 1011(g), Vernon's Ann.Civ. Stats., reading in part: "Appeals to the board of adjustment may be taken by any person aggrieved or by any officer, department, board, or bureau of the municipality affected by any decision of the administrative officer. Such appeal shall be taken within a reasonable time, as provided by the rules of the board, by filing with the officer from whom the appeal is taken and with the board * * *." And cited in support of the plea of res adjudicata thus presented is the case of Washington v. City of Dallas, Tex.Civ.App., 159 S.W. 2d 579, by this Court. We do not think the municipality bound by above statutory provision when an act of its building inspector is challenged as void and violative of the zoning ordinance; especially so, in view of its cumulative right of action explicit in Art. 1011(h), viz.: "In case any building or structure is erected, constructed, reconstructed altered, repaired, converted, or maintained, or any building, structure, or land is *used in violation of this Act* or of any ordinance or other regulation made under authority conferred hereby, the proper local authorities of the municipality, in addition to other remedies, *may institute any appropriate action or proceedings* to prevent such unlawful erection, construction, reconstruction, alteration, repair, conversion, maintenance, or use, to restrain, correct, or abate such violation, to prevent the occupancy of said building, structure, or land, or to prevent any illegal act, conduct, business, or use in or about such premises." (Emphasis added.) Obviously the outlined procedure of an appeal to the board of adjustment is confined to matters within the jurisdiction of that body, i. e., a practical administration of the ordinance as written; for neither building inspector nor board of adjustment has the power, by issuance or ap-

proval of a permit, to amend or repeal the ordinance. When the act complained of, therefore, is alleged to be void and wholly unauthorized we have the exceptional situation where either an individual or the municipality may have direct recourse to the courts. City of Amarillo v. Stapf, 129 Tex. 81, 101 S.W.2d 229.

To the merits, appellant argues validity of original permit, in that his plant operation was merely the continuation of a recognized nonconforming use; appellees, on the other hand, answering that the nonconforming use of the premises (ice factory) had been abandoned prior to Rosenthal's purchase, perforce of which the issuance of permit for other than a conforming use (apartment) was void; the secondary question raised being that defendant's purchase and attempted use of the property for purposes other than a business allowable as a nonconforming use (ice factory, cold storage, etc.), constituted an abandonment of the existing nonconformity by operation of law. It is our opinion as a matter of law that there was no abandonment of the prior nonconforming use until effectuated by defendant's own change of operation.

On the issue of abandonment of this ice factory for commercial uses, the testimony of Mr. C. E. Kennemer (a principal officer of the corporation owning title) is controlling. He states that after ceasing to manufacture ice in 1939 or 1940, refrigeration was maintained for storage and sale of ice relayed from other plants, also retailing groceries and perishable foods, doing no retail grocery business there after 1942; that they had removed the old ice plant machinery (obsolete) intending to rebuild a modern plant, when the war came on, making it impossible to get new ice machinery; that he had talked to sales agents representing manufacturers who wouldn't even take the orders; having sold other properties belonging to the corporation, but retaining that owned on Lemmon Avenue, expecting "to develop it if conditions had been favorable"; the only thing preventing development, according to Mr. Kennemer, was the war and ill health on his part. Under well settled principles applicable to zoning laws, it follows conclu-

sively, we think, that the court's issue on "abandonment" was not raised in the testimony of Mr. Kennemer. "The clear weight of authority is that discontinuance of a non-conforming use results from the concurrence of two factors, (1) the intent to abandon and (2) some overt act or failure to act which carries the implication of abandonment." Wood v. District of Columbia, D.C.Mun.App., 39 A.2d 67, 68; Dorman v. Mayor and City Council, Md., 51 A.2d 658. "It may be stated generally that a mere temporary discontinuance of a prior nonconforming use will not of itself show an abandonment thereof so as to preclude resumption of such use; and this has been held true even though the discontinuance existed over a considerable period of time." 114 A.L.R. 991 Annotations. Furthermore, issue 33 (on abandonment) was inconclusive, absent a jury finding on intent to abandon.

But defendant's purchase and operation of the property for meat processing and curing as an equivalent to the prior nonconforming use, presents, we think, a situation entirely different, resulting in a termination of all uses except in conformity with ordinance; section 9 thereof, "Nonconforming Uses," reading: "Any use of property existing on September 11, 1929 that does not conform to the regulations prescribed in the preceding articles of this chapter shall be deemed a nonconforming use. (2) A nonconforming use may be continued subject to such regulations as to the maintenance of premises and conditions of operation as may, in the judgment of the board of adjustment, be reasonably required for the protection of adjacent property. (3) *A nonconforming use shall not be extended,* but the extension of a use to any portion of a building which portion was arranged or designed for such nonconforming use on September 11, 1929 shall not be deemed the extension of a nonconforming use. (4) *A nonconforming use shall not be changed* unless changed to a conforming use. A nonconforming use if changed to a conforming use may not thereafter be changed back to any nonconforming use. For the purpose of this chapter, a use shall be deemed to be changed if changed from the use listed in

one of the numbered paragraphs of articles 165-3, 165-4, 165-5, 165-6, 165-7 or 165-8 of this chapter to a use not listed in such paragraph." (Emphasis ours.) A nonconforming use shall not be "changed," says the ordinance, unless to a conforming use; but that a shift from one business to another of the same classification is not to be deemed a change in use. "Cold storage plant" is then listed in section 4, Commercial District, along with "ice manufacture"; and thus defendant claims validity of permit, arguing that his business is simply the continuance of a like or similar use. But defendant is not engaged primarily in the cold storage of meats; Stewart v. Atlanta Beef Co., 93 Ga. 12, 18 S.E. 981, 44 Am.St.Rep. 119; the refrigeration of meats being merely an incident to his dominant enterprise of meat processing or packing; becoming a new and substantially different use and, from a survey of the Use Districts (Dallas City Code, Art. 165, 3-8), of a different and lower classification. "The underlying spirit of a comprehensive zoning plan necessarily implies the restriction, rather than the extension, of a nonconforming use of land, and therefore to whatever extent the particular act fails to make express provision to the contrary, a condition that the lawful nonconforming use of land existing at the time of the adoption of the ordinance may continue must be held to contemplate only a continuation of substantially the same use which existed at the time of the adoption of the ordinance, and not some other and different kind of nonconforming use which the owner of the land might subsequently find to be profitable or advantageous." In re Botz, 236 Mo.App. 566, 159 S.W.2d 367.

The words "continued," "extended," and "changed," of Art. 165-9, Dallas Code (Nonconforming Uses), have not been heretofore the subject of precise definition, but the Standard Form, State Zoning Act, furnished by the Department of Commerce in 1926 (Bassett on Zoning, p. 29), has been uniformly followed as a pattern by legislatures and municipalities. Decisions of other states on nonconforming uses, therefore, are highly persuasive, being generally in accord with the Botz appeal,

supra. Thus in National Lumber Products Co. v. Ponzio, 133 N.J.L. 95, 42 A. 2d 753, 755, it was held, "The nonconforming use must be a continuation of the same use and not some other kind of use." In Steudel v. Troberg, 76 Ohio App. 136, 63 N.E.2d 241, 243, the court went on to say: "As we construe the ordinance, a nonconforming use is not deemed 'changed' if the use falls within the same subdivision of the use class. * * * If, however, a business not named or recognized in the particular subdivision supplants a business therein named or recognized, such use shall be deemed 'changed' and therefore unlawful, unless changed to a higher use." "The present use of a non-conforming building may be continued but it cannot be increased nor can it be extended indefinitely if zoning is to accomplish anything." Selligman v. Von Allmen Bros., 297 Ky. 121, 179 S. W.2d 207, 209. See also In re Appeal of Yocom, 142 Pa.Super. 165, 15 A.2d 687; DeFelice v. Zoning Board, 130 Conn. 156, 32 A.2d 635, 147 A.L.R. 161; Burmore Co. v. Smith, 124 N.J.L. 541, 12 A.2d 353; McQuillen, Mun.Corp., 2nd Ed., Vol. 3, Notes to Sec. 1034, including 1945 and 1947 supplements.

Aside from above considerations, the jury verdict and establishment of common law nuisance, if supported by testimony, likewise forms a basis of the restraint imposed by judgment on defendant's plant as maintained; unless the noise, smoke, sights and odors (as found by the jury) can be eliminated from its operation. These findings further relegate defendant's business to the uses incident to either a first or second manufacturing district.

Defendant denied in effect all charges of nuisance and, without narration of testimony thereon from interveners (living along Lemmon Avenue in the same or adjacent blocks), we find competent evidence in support of issues One to Thirty-two— the jury answers thereto being as hereinabove indicated.

The objection made to form of these issues, because not including all twenty-six interveners as a class, is overruled. Any one of these complainants could have maintained the action on proof of special in-

jury; 31 Tex.Jur., p. 450. "One who has sustained damage peculiar to himself from a common nuisance has a cause of action, although a like injury has been sustained by numerous other persons." Haney v. Gulf, C. & S. F. Ry. Co., 3 Willson Civ. Cas.Ct.App., §§ 278, 279. Neither did the court err in refusal of defendant's requested issues (twelve in number), they involving matters either (1) evidentiary, or (2) the negative of given issues, or (3) becoming questions of law under the whole record as we view it. Refused issue 37, for example, requests a finding on whether or not the property in question is suitable for apartment use; based on allegations that a zoning ordinance classifying the area for apartment use and a later Council action refusing to rezone for light manufacturing, were arbitrary, unreasonable, having the effect of confiscation of defendant's property. The area, intersected by a high railway embankment, is otherwise occupied by residences on the south; immediately to the north on Lemmon Avenue beyond the tracks being two small business places; also Turtle Creek Lake and Lee Memorial Park. It is well settled that attacks upon zoning laws and ordinances of a City Council in the particulars complained of, (whether reasonable or arbitrary), involve matters for the court and not the jury to determine. City of University Park v. Hoblitzelle, Tex.Civ. App., 150 S.W.2d 169; City of Dallas v. Lively, Tex.Civ.App., 161 S.W.2d 895; Edge v. City of Bellaire, Tex.Civ.App., 200 S.W.2d 224, (writ refused).

Other refused issues relate to knowledge by plaintiff and interveners of, and their acquiescence in, the substantial improvements made by defendant on the lots between August 1944 and March 1946, when permit was revoked. The defense of equitable estoppel is thereby interposed, in that issuance of permit, following a full disclosure of the use to be made of the premises, reliance on the permit in the making of improvements, and long operation of business without complaint by City or interveners, resulted in vested rights of which he could not be deprived by the attempted revocation. It is proper to note here that appellant's reliance on the orig-inal permit for his heavy investment thereafter made in property improvements, was not altogether warranted by its terms. His 1944 application estimated total cost of partitions and equipment at $4,000, permit to cover only work applied for; the printed matter on permit receipt stating that if costs or value of construction work exceeded the amount shown on application "a new permit shall be taken out before proceeding with such extra work"; providing further (in face of permit) that all construction shall be subject and conform to the building and zoning ordinances of the City. Art. 165-18 (City Code) provides: "(1) No building hereafter erected or structurally altered shall be used, occupied or changed in use until a certificate of occupancy and compliance shall have been issued by the building inspector, stating that the building or proposed use of a building or premises complies with the building laws and the provisions of these regulations. (2) Certificates of occupancy and compliance shall be applied for coincident with the application for a building permit and shall be issued within 10 days after the erection or structural alteration of such buildings shall have been completed in conformity with the provisions of these regulations. * * *" No certificate of occupancy ever issued, but, notwithstanding the contingencies just suggested, expenditures were made of at least $60,000, thereby demonstrating (1) that many of the costly steps taken by defendant were at his own risk; Selligman v. Von Allmen Bros., 297 Ky. 121, 179 S.W. 2d 207; and (2) that his right of use even under an entirely valid permit remained inchoate rather than vested or fixed, until issuance of certificate of occupancy.

It is our opinion, however, that issuance of the August 1944 permit was unauthorized because violative of a zoning ordinance, the principle invoked under the facts of City of Corpus Christi v. Jones, Tex.Civ.App., 144 S.W.2d 388, being equally applicable here. See also 9 Am.Jur., p. 204; City of Amarillo v. Stapf, supra; Edge v. City of Bellaire, Tex.Civ.App., 200 S.W.2d 224, (writ refused); and City of San Angelo v. Deutsch, 126 Tex. 532, 91

S.W.2d 308, 310, where the court said: "* * * The rule that a city is not estopped by the mistakes or unauthorized or wrongful acts of its officers or agents is thus stated in Ruling Case Law: 'No estoppel can grow out of dealings with public officers of limited authority, and the doctrine of equitable estoppel cannot ordinarily be invoked to defeat a municipality in the prosecution of its public affairs because of an error or mistake of, or because of a wrong committed by, one of its officers or agents which has been relied upon by a third party to his detriment. * * *'"

But if we be mistaken in above conclusion, the suit of appellees is also for abatement of a nuisance. Manifestly, defendant's operation, even under a valid permit, would not justify the creation or maintenance of a nuisance. Missouri, K. & T. Ry. Co. v. Mott, 98 Tex. 91, 81 S.W. 285, 70 L.R.A. 579; defendant's plea, on this phase of the instant proceeding, having simply the effect of a general denial.

Defensive evidence was likewise to the effect that no condition of nuisance existed; but without narration of testimony we believe that appellees are undoubtedly entitled to relief on this phase of the litigation, the specific jury findings sufficiently establishing a nuisance in fact. Neither does defendant offer any alternatives in changes of operational methods whereby the objectionable features, as found, might be eliminated. While courts are slow to interfere by injunction in the conduct of a business enterprise, full restraint must necessarily follow the establishment of a nuisance when the elements constituting the nuisance appear inseparable from its operation. We are assuming for the moment that appellant's activities are but the continuation of a valid nonconforming use in an effort to render applicable the well settled doctrine that where a legal business is conducted in such a manner as to constitute a private nuisance, such may be abated, but the injunction would ordinarily be limited to the practices that create the nuisance; and that it is only where such business cannot be conducted in any manner at the place where situated without becoming a substantial injury to adjoining property owners, that the enterprise itself will be enjoined. See 39 Am. Jur., sec. 172, pp. 444, 445 and footnotes.

Appellant in reiterated points calls attention to more severe provisions of the court's mandate, tantamount in effect to a confiscation of his property, viz.: (1) Tearing down and removal of the two-story annex and boiler room and restoration of structure as of August 7, 1944; (2) removal of incompleted garage building, or use of lots 12 to 16, except for garage incidental to an apartment district; (3) from further operating a nonconforming use on the other lots, such as ice factory, cold storage, etc. These drastic recitals would appear but the logical result of a violation of zoning (operation of prohibited business in apartment district); but the command to restore the old factory structure is seen to be wholly gratuitous, in view of the court's conclusion of Kennemer's previous abandonment of any nonconforming use.

Otherwise we have diligently examined, but without success, all analogous cases in search of an available remedy for the unfortunate position occupied by defendant and his business in reliance upon a building permit later determined to be void and unauthorized. In the exercise of its police power (a governmental function) appellee City undertook a revocation of both permits, the suit involving (1) violation of zoning laws, Art. 1011, 1011h, and (2) abatement of a condition of nuisance, Art. 1015(11); and, as has already been held, the municipality is not precluded from establishing these grounds of action by plea of equitable estoppel; City of Corpus Christi v. Jones, and City of Amarillo v. Stapf, supra; Godson v. Town of Surfside, 150 Fla. 614, 8 So.2d 497. While an unauthorized permit may not be arbitrarily revoked where the owner has incurred material expense on the good faith of it, as a general rule such an instrument "has none of the elements of a contract and may be changed or entirely revoked, even though based on a valuable consideration, if it becomes necessary to revoke it in the exercise of the police power." 43 C.J., p. 349; 9 Am.Jur., p. 204. Undoubtedly under the present facts and circumstances, the dilemma in which defendant has been

placed is a most unhappy one: his losses, from any viewpoint, arising from acts and conditions that, in turn, create no grounds of legal redress; in short, damages without legal injury.

However, as paragraphs 1 to 4, and 7 to 15, inclusive, afford to appellees adequate relief on both phases of their litigation, all of paragraph 6 and that part of paragraph 5 ordering a mandatory tearing down, removal and destruction of buildings appurtenant to lots 11, 12 and 13, lots 14 to 16, block 1/973, are deemed unnecessarily oppressive; and such designated provisions are hereby deleted and stricken from said final judgment. Otherwise, but as above modified, the judgment under review is affirmed.

LOONEY, J., dissents.

### On Motion for Rehearing.

Rehearing denied.

LOONEY, Justice (dissenting Opinion on rehearing).

I find myself out of harmony with the majority on the disposition of this case. As is obvious, the record is quite voluminous, but I think a clear understanding of the nature of the case can be ascertained from the majority opinion by Associate Justice Young. The City brought the suit on the theory that a nonconforming use did not exist and that the permits issued to appellant were unauthorized and void ab initio. This contention was concurred in by the interveners and sustained by the trial court in special findings to that effect.

The majority opinion (page 284 of S. W.2d) states: "It is our opinion as a matter of law that there was no abandonment of the prior nonconforming use until effectuated by defendant's own change of operation." This statement is followed by an array of pertinent facts, stating in conclusion that "Under well settled principles, applicable to zoning laws, it follows conclusively, we think, that the court's issue on 'abandonment' was not raised in the testimony of Mr. Kennemer" (the prior owner), citing several pertinent authorities.

I am in perfect accord with the majority in the conclusion that the nonconforming use had not been abandoned by the prior owner and was in existence at the time of appellant's purchase; and I am also of opinion that the nonconforming use extended to and included the lots upon which appellant was building a garage when the stop-work order was served upon him.

Bearing upon the latter question, Mr. Kennemer's testimony is undisputed. He said it was his intention to use those lots in connection with the others as an entirety "and that is why we acquired it." He said further: "We removed the old machinery which was, in our opinion,—and we know—obsolete, and we intended and had made our arrangements to rebuild a modern electric plant such as we own three or four of in the City, and a number of them elsewhere, and about that time it became impossible to get ice machines of any consequent size or capacity. We couldn't get them delivered at all, and you can't get them until now. You can't get them now. And we kept holding onto that property with the full intention—there never had anything been issued, any restrictions by the City of Dallas, or anybody else, to prohibit us, as far as we knew,—" (p. 54, printed brief).

In a similar situation, the Supreme Court of Oklahoma, in Royal Baking Co. v. Oklahoma City, 182 Okl. 45, 75 P.2d 1105, held "that where a baking company prior to the enactment of an ordinance which placed the area in which it was situated in a residential zone was well established as a going legitimate concern and had, with the intention of expanding its business, purchased the adjacent lots with the purpose of using them in the conduct of its business, including such things as might be incidental thereto, it was entitled, after the enactment of such ordinance, to use a building originally constructed as a residence upon one of the adjacent lots, as a garage for the purpose of repairing its own trucks, * * *." (p. 56, printed brief.)

However, after correctly holding that the nonconforming use had not been abandoned at the time of appellant's purchase, I think

the majority erred in holding that the appellant abandoned such use, saying in this connection: "But defendant is not engaged primarily in the cold storage of meats (citing some authorities); the refrigeration of meats being merely an incident to his dominant enterprise of meat processing or packing; becoming a new and substantially different use * * *." (See p. 285 of S. W.2d, opinion.) The latter holding, in my opinion, is erroneous for two reasons: First, no such issue was presented in the pleadings nor was it relied upon as a ground of recovery by appellees; the only issue presented by the pleadings on the question of abandonment and submitted to the jury, was whether Mr. Kennemer, the prior owner, had abandoned the nonconforming use before appellant's purchase. Seemingly, this highly material and pivotal issue was raised by, and appears for the first time in the majority opinion (pp. 284–285 of S.W. 2d, opinion).

 I think an issue so material that, if sustained, would deny to appellant the right to use the property for any purpose other than as permitted in an apartment or residence district, hence utterly destructive of his right to use the property under the nonconforming use as a cold storage and its accessory purposes, should have been plead and appellant given an opportunity to answer and try out the issue in the customary manner. For this reason I think the majority erred in holding that appellant abandoned the nonconforming use by devoting the property to "a new and substantially different use."

 Again, I think the majority erred in such holding, in that I do not believe the evidence warranted the conclusion that the property had been subjected to a new and substantially different use; but rather I think the evidence shows that the property was used for cold storage and accessory purposes, as that term was construed and administered by the officials of the City of Dallas. The testimony bearing upon this question is that of Mr. Hansen, assistant building inspector in charge of the subject, and Mr. Dillard, Assistant City Attorney. Mr. Hansen testified that his first interview with appellant was on August 7, 1944, short-

ly before the issuance of the permit. He said: "Mr. Rosenthal told me that he was interested in the purchase of this property for installing freezing, a cold storage plant. He would handle meat." At another place the witness said "He would handle meats, sausage, general run of things that are handled in these cold storage plants. I questioned him fairly closely on just what his processes were, what he did, whether there was any slaughtering or not, and he assured me that he had no intention of—He assured me that he had no intention of slaughtering of any kind, cattle, fowl, or anything else. That it was strictly a cold storage operation with the usual side lines of making sausage and various meat products. Then he wanted to know if we would issue a permit for his necessary remodeling, and I told him when he filed his application we would issue the permit." Mr. Hansen stated further that he discussed the matter with Mr. R. L. Dillard, Jr., Assistant City Attorney, and that he acted on the legal opinion received and issued the permit; the permit being for the use of the property for a cold storage "including meat storage and curing."

Mr. Dillard, Assistant City Attorney, participated in this conference and testified in substance that Mr. Rosenthal, the appellant, was in the meat-packing business of some kind. Mr. Hansen, assistant building inspector, said it was his opinion from an investigation of the facts that Mr. Kennemer, the party from whom appellant purchased the property, had a nonconforming use for the operation of an ice plant, in that he had been there for many years, and asked witness the question: "What is your opinion about the proposition of Mr. Rosenthal to convert that from ice manufacturing to cold storage?" That they then discussed the terms of the ordinance and told Mr. Hansen that he had the right to determine whether or not Mr. Kennemer and his successor in title (Mr. Rosenthal) had a nonconforming use; that Mr. Hansen informed witness that in his opinion it was a nonconforming use; that witness told Hansen he would have a right to change from ice manufacturing to cold storage. Then the question arose as to what cold storage meant or stood for, and

witness advised that it included any use that was auxiliary or incident to the main use; and that some question arose as to the making of sausage or preparing of sausage or packing of sausage, and witness advised Mr. Hansen that that was a fact question as to whether or not it was customarily incident to a cold storage to have this type of use and he said he thought it was, based on his experience over town in investigation and knowledge of cold storage plants. Witness said that he outlined the result of his conference to Mr. Thuss, acting City Attorney at the time, and he concurred in the advice given by witness. The witness testified that Mr. Hansen pointed out that the type of operation of a cold storage plant such as they were discussing was the same type carried on by others that were located in a commercial district and that he understood the appellant had in mind the operation of the same type that all the cold storage plants were carrying on, and of course the witness said that was based in part on the language of the ordinance which says: "Accessory uses customary to the main use on the premises." A Q&A report of the testimony of Mr. Kennemer and Mr. Dillard will be found in the printed brief, pp. 24 to and including p. 30.

The term cold storage is not defined in the ordinance, but is defined in general terms in dictionaries—such "as the storage of provisions, etc., in a place artificially cooled" (New Century Dictionary); and "storage as of provisions in a place kept cold for preservation purposes" (Webster's New International). However, the term as construed and administered by the officials of the City of Dallas, in my opinion permitted the uses as substantially pursued by the appellant.

Executive or Departmental Construction of statutes is discussed in 39 Tex.Jur., sec. 126, pp. 235 to 238: "The courts will ordinarily adopt and uphold a construction placed upon a statute by an executive officer or department charged with its administration, if the statute is ambiguous or uncertain, and the construction so given it is reasonable. In other words, the judiciary will adhere to an executive or departmental construction of an ambiguous statute unless it is clearly erroneous or unsound, or unless it will result in serious hardship or injustice, although it might otherwise have been inclined to place a different construction upon the act. The rule above stated is particularly applicable to an administrative construction of long standing, where valuable interests or rights have been acquired or contracts have been made, or where a law that has been uniformly construed by those charged with its enforcement has been re-enacted without a change of language. * * *."

If, however, it can be said that the appellant, during the operation of his business, departed in some particular from the uses permitted as accessories to a cold storage plant, yet I think that in substance his operations were authorized as accessories to a cold storage as construed and permitted by the administrative and executive officers of the City; and that such misuse could and should have been corrected by injunctive relief and did not authorize the destructive and confiscatory judgment that was rendered.

 In course of the majority opinion (at page 286 of S.W.2d), it is also said: "It is our opinion, however, that issuance of the August 1944 permit was unauthorized because violative of a zoning ordinance * * *." This holding, in my opinion, is somewhat in conflict with the prior holding heretofore discussed where the majority said "It is our opinion as a matter of law that there was no abandonment of the prior nonconforming use until effectuated by defendant's own change of operation." That the nonconforming use for the operation of an ice factory existed at the time appellant purchased the property from Mr. Kennemer, cannot, in my opinion, be successfully challenged, in view of the undisputed testimony of Mr. Kennemer as heretofore shown; also that such nonconforming use permitted the use of the property as a cold storage and its accessories such as the storage and curing of meats, as shown by the testimony of Mr. Hansen, assistant building inspector, who acted for the City in the premises.

All this being true, as shown by the record, I think the permit of August 1944 "for the erection, remodeling, repairing and demolition of buildings, or parts thereof, as provided in the Dallas Building Ordinance" for the operation at the same place of a cold storage plant, including meat storage and curing, was authorized and valid; and not having been appealed from by the City authorities or interested citizens, cannot now be collaterally attacked.

■ The building inspector was the only City official who could lawfully determine the existence of facts supporting the nonconforming use and the classification of the operations proposed by the appellant; and the determination of these questions being placed upon the inspector by the legislature and the City Council, his rulings when supported by evidence as in the instant case, cannot be attacked except by appeal as provided in Art. 1011g. See Trapp v. Shell Oil Co., 145 Tex. 323, 198 S.W.2d 424, 441, where established rules of administrative law are set forth to the effect that the determination of facts by a designated Board or official cannot be overturned and the court's judgment substituted, where such determination is supported by substantial evidence; and the Supreme Court has stated the rule in the case cited above as follows: "The court is not to substitute its discretion for that committed to the agency by the Legislature, but is to sustain the agency if it is reasonably supported by substantial evidence before the court."

■ In the majority opinion mention is also made of the failure of appellant to obtain an additional permit for the extra expenditures on erections and alterations of buildings; also his failure to obtain a certificate of occupancy (in my opinion a mere ministerial act) after completion of the new, and alteration of old buildings, which, in my opinion, were waived by the City authorities who from time to time inspected the buildings as the work progressed; and I think they should now be held estopped to complain of appellant's failure to obtain the additional permit or the certificate of occupancy.

Mr. Hansen, assistant building inspector at the time, testified in regard to his inspection of the premises during progress of the work; said he went out on two occasions in September 1944 in regard to several matters which were adjusted; and Pat Parkinson, also assistant building inspector, testified in regard to inspection of the property during progress of the work, stating that he first visited the property in December 1945, and off and on during all of 1946; that he saw the garage building after it was started and was going up; that the size of the building and the material used in construction were substantially the same as provided in the purported permit; that he knew of nothing that was wrong in regard to the building; and as far as he knew, the building was all right and in accordance with the building permit. Mr. R. H. Cummings, the present building inspector, testified that it was common practice that plans and specifications are not literally complied with in repairing and remodeling jobs under permits (S.F. 368); and Pat Parkinson, assistant inspector, testified that "ninety percent of the permits are underestimated, and that the permits are not canceled for exceeding in value the amount provided in the permit." (S.F. 168).

The defenses of estoppel, acquiescence and laches were properly raised in appellant's pleadings (Tr. 65–66). The record discloses that the expenditures for erection, repairs, remodeling of buildings, and the installation of machinery cost about $60,000 and that these expenses plus the amount expended for the lots brought the total expenditures up to about $100,000; and the record further discloses that from August 1944, date of the original permit, until March 21, 1946, some eighteen months thereafter, no official action was taken by the City to stop the work for any failure, for any departure from the purposes permitted, for the excessive expenditures, or failure to obtain certificate of occupancy. I think it is obvious that not only the City of Dallas, through its various officers and agents, knew that the work was progressing; that funds in excess of the original permit were being ex-

pended; that no additional permit had been issued; and that no certificate of occupancy had been issued; for none knew better in regard to these matters than the City officials; and, notwithstanding this knowledge, they knew the property was being operated for the uses complained of and were fully cognizant of all the facts which are now asserted as ground for injunctive relief. In view of these undisputed facts, I think that appellant acquired a vested property right in the permit; that the attempted revocation was arbitrary and unreasonable and that the appellees are estopped; and furthermore in this connection that the court erred in refusing appellant's requested issues, Nos. 35, 36 and 40; also that the majority erred in affirming this action of the trial court (p. 285 of the S.W.2d of the opinion). The requested issues were as follows: No. 35: "Do you find and believe from a preponderance of the evidence that defendant Rosenthal made substantial improvements and expended substantial sums of money at his place of business in question, with the knowledge of plaintiff and interveners for the period beginning in August, 1944, and prior to the time of the attempted cancellation of the permit in March, 1946?" No. 36: "Do you find and believe from a preponderance of the evidence that the changes, additions, and alterations made by the defendant at his main plant, 3307 Lemmon Avenue, were made with the knowledge or acquiescence of the agents of plaintiffs and interveners?" No. 40: "Do you find and believe from a preponderance of the evidence that defendant substantially complied with the plans, specifications and method of construction as described in his purported permit for the garage in question?"

I know of no reason why the conduct of a city, acting as it must act through its authorized agents in the enforcement and administration of the zoning law, should be considered so sacrosanct as to be immune from the application of the doctrine of estoppel as the same is applied to individuals and corporations in the varied relations of life. I do not think such is the law. On the contrary, I think the law is as held in Bassett on Zoning, p. 106, that "Where a building department through mistake has issued a permit for a nonconforming building, and construction has proceeded and no appeal to the Board of Appeals has been taken by neighbors the permit will not be revoked. Call Bond & Mortgage Co. v. Sioux City, 219 Iowa 572, 259 N.W. 33; Freeman v. Hague, 106 N.J.L. 137, 147 A. 553; Wikstrom v. City of Laramie, 37 Wyo. 389, 262 P. 22." In the case of Freeman v. Hague, 106 N.J.L. 137, 147 A. 553, it was held that the superintendent of building having issued a building permit on January 17, 1928, for the construction of a five-car garage, the Board of Commissioners' action on April 10, 1928, in passing a resolution revoking the permit, was invalid, without lawful authority, where the permittee had expended moneys in prosecution of the work and entered upon contractual relations with builders, unless it appears that such permit was obtained by fraud or deceit. In the instant case the record is bare of any evidence of fraud or deception practiced by the appellant. On the contrary he met with the building inspector and the City Attorney before he purchased the property and explicitly stated the character of business he intended to pursue; in fact laid all the cards on the table, so to speak. The rule was also stated in Wikstrom v. City of Laramie, 37 Wyo. 389, 262 P. 22, that where the City Council or the proper City officials, in absence of fraud, grants a permit for construction of a building and the party, acting in good faith, begins erection of the building, the permittee acquired something in the nature of a vested right, more than a mere license, and the permit could not then be revoked by the City; and in City of Evansville v. Gaseteria Inc., 7 Cir., 51 F.2d 232, 237, it is stated: "Expenditure by appellee of this large amount on installation and equipment of this plant, under the facts and circumstances here appearing, in our judgment presents a case where the revocation of the permit, and stoppage of the work, would deprive appellee of its property without due process of law. Dobbins v. City of Los Angeles, 195 U.S. 223, 25 S. Ct. 18, 49 L.Ed. 169."

In the instant case the permit issued to appellant for operation of a cold storage plant including meat curing was based on specific finding of the existence of a non-conforming use by the building inspector who is charged with the duty of enforcing this ordinance, from which no appeal was prosecuted by either City officials or interested individuals. In my opinion the action of the building inspector became, in a sense, res judicata. See article in Texas Law Review, Vol. 25, No. 3, pp. 199–246, by Professor Kenneth Culp Davis, which states (at p. 240) that: "To some extent this theory of direct and collateral attack has been carried over into administrative law. The theory is that a party who fails to make a direct attack on an administrative order is barred by res judicata from making a collateral attack except when the order is void on account of such a reason as fraud or lack of jurisdiction or denial of fair hearing. * * * If a statutory method of review is prescribed any other method of attack if permitted is likely to be deemed collateral. Washington v. Dallas, Tex.Civ.App., 159 S.W.2d 579."

I think it is now so well settled in this State as not to require the citation of authorities that a defendant is entitled to an affirmative submission of all defensive issues raised by pleadings and evidence and that a finding on plaintiff's issues is not sufficient to deprive a defendant of an unconditional submission of his defensive issues.

The trial court in my opinion erred in refusing to submit appellant's issue No. 37, and I think the majority erred in affirming this action of the trial court. This issue reads: "Do you find and believe from a preponderance of the evidence, under all the facts and circumstances of this case, that the property in question is not suitable for apartment usage?"

The property in question is located on Lemmon Avenue in the City; its immediate southwest boundary is the right-of-way of the MK&T Railway; the embankment for its tracks is higher than appellant's adjacent buildings; at this point on the street there is an underpass; the property in question had been used for commercial and light manufacturing purposes for more than forty years. There are no new residences in the immediate area which, it seems, is suffering from the encroachment of businesses. Lemmon Avenue has been designated as a crosstown thoroughfare and appellant's buildings on the lots, erected and used for business purposes, could not well be utilized or converted into residences or apartments, but under the judgment of the court would have to be torn down. In view of the situation thus briefly stated, I think the requested issue should have been given and if the jury had answered that the property in question was not suited for apartment purposes, to prohibit appellant from using the property for purposes authorized under his permit would, in the last analysis, amount to confiscation.

Many cases more or less in point could be cited, such as Stone v. Kendall, Tex. Civ.App., 268 S.W. 759; Spahn v. City of Dallas, 111 Tex. 350, 235 S.W. 513, 19 A.L.R. 1387; Houston & T. C. Ry. Co. v. City of Dallas, 98 Tex. 396, 84 S.W. 648, 70 L.R.A. 850; City of Amarillo v. Stapf, Tex.Civ.App., 109 S.W.2d 258 (app. for writ dismissed); and Tews v. Woolhiser, 352 Ill. 212, 185 N.E. 827, 831, where among other things the court said: "It lies not within the power of a municipality to so zone property as to render it worthless. Such is not zoning—it is confiscation." However, the case that I think is more nearly in point is that of City of West University Place v. Ellis, 134 Tex. 222, 134 S.W.2d 1038, 1041 (by the Commission, opinion adopted by Sup. Ct.), where among other things the court said: "There is ample evidence to sustain a finding that defendant's lot is practically worthless as residential property. In the first place, a residence thereon would have to be located within a few feet of a drugstore and liquor store. In the next place, it would have to be located practically upon the brink of a deep drainage ditch, which the photographs showed carried a considerable flow of water. Besides, the lot faces upon the principal thoroughfare of the city, and immediately across the street from same another street opens into

University Boulevard. It is thus seen that a residence on this lot would be subjected to all of the discomforts and inconveniences of a constant stream of traffic. In addition, there is already a business being conducted immediately east of the lot. While mere inconvenience and depreciation in value are not sufficient within themselves to constitute unreasonableness, yet it is settled that when depreciation in value is such as to make the property practically worthless for the designated use, this constitutes confiscation."

I also think that the trial court erred in refusing appellant's requested issue No. 43; also that the majority erred in affirming this action of the trial court. The requested issue reads: "Do you find and believe from a preponderance of the evidence that offensive and obnoxious odors could be detected by a person of ordinary prudence on the outside of defendant's plant, and beyond the boundaries of his property?" Bearing upon this issue, the record discloses the following: Major E. A. Wood, City Planning Engineer, witness for the City, testified among other things that he was familiar with the property in question; that he had passed there quite often and had never smelled any offensive odors (S.F. 48); that he had not observed any odors or noises which would interfere with the operation of Lee Park (S.F. 49); and that he had not observed any offensive smoke from appellant's plant since it had been in operation (S.F. 50). Mr. Parkinson, one of the inspectors for the City, testified that on one occasion he investigated a complaint of alleged noises which had been corrected; that he had never observed any smoke from the plant; was certain that there had never been any slaughtering of any kind in connection with the operation of appellant's plant, etc. Monroe Metcalf, another of the City inspectors, testified that he had inspected the United States Cold Storage plant, the Dickey Sausage plant, and others in the City of Dallas and that their operations were similar to those being conducted by the appellant (S.F. 493); and C. A. Bruning, one of the inspectors, testified that he had made official inspections of appellant's plant twice daily for the preceding six months under the direction of Mr. Metcalf, and that he had not observed any offensive odor or smoke during such inspections (S.F. 496, 497).

In view of the testimony of these witnesses, I think it became obligatory on the trial court to submit to the jury the requested issue just set out and that the court committed reversible error in refusing same.

In conclusion, beg to say that in view of the reasons heretofore set out, I think appellant's motion for rehearing should be sustained and that the case should be reversed and remanded to the trial court for further proceedings.

BOND, Chief Justice (concurring Opinion to Justice Looney's Opinion on Rehearing).

On original submission of this appeal I came to the conclusion, as reflected by our opinion by Associate Justice Young, that the judgment of the court below should be affirmed, modified, however, by releasing the unnecessary or oppressive mandatory order for appellant to tear down or remove his buildings erected in accordance with permit by the City of Dallas, evidently in view and knowledge of the resident interveners. On motion for rehearing I have reversed my conclusion and am in accord with the opinion by Associate Justice Looney that the judgment of the trial court should be reversed and cause remanded to the trial court for further proceedings, particularly a determination of the issue as to whether the property in question, under all the facts and circumstances, is not suitably situated to be zoned by the City for apartment usage. Manifestly, if the property is not suitable for the purposes as zoned, such should not be zoned, and in doing so, it is confiscation. Appropriate issue was requested and refused by the trial court to determine whether the property was suitable for apartment usage. I am of the opinion such should have been submitted, and the issue determined along with other pertinent issues as reflected by the record, and recited in the dissenting opinion of Justice Looney.

Having reversed my conclusion, it follows that the dissenting opinion of Justice Looney becomes the opinion of the court; the original opinion edited by Justice Young thus becomes the dissenting opinion.