STATE OF MISSOURI, RESPONDENT, v. ED. CLARK, APPELLANT.[*]

Kansas City Court of Appeals. November 8, 1926.

[*]Corpus Juris-Cyc References: Criminal Law, 16CJ, p. 539, n. 43; p. 670, n. 68; p. 928, n. 79; p. 999, n. 75; Intoxicating Liquors, 33CJ, p. 588, n. 49; p. 617, n. 64; p. 782, n. 52, 63.

*Theo. J. Wulber* for respondent.

*Hunt & Hunt* for appellant.

BLAND, J.—Defendant was convicted under section 6594a of the Statutes (see Laws of 1921, p. 414) of maintaining a nuisance by having in his possession and under his control a dugout, excavation or cellar where intoxicating liquor was manufactured. His punishment was fixed at a fine of $400 and imprisonment of one year in the county jail. He has appealed.

It is insisted by defendant that the information upon which he was convicted does not charge sufficient facts to constitute an offense. The information charges the defendant with maintaining or assisting in maintaining "a public and common nuisance consisting of a dugout, excavation, cellar and place where intoxicating liquor was then and there being manufactured," etc. The statute prescribes—

"Any room, house, building, boat, vehicle, structure or place of any kind where intoxicating liquor is sold, manufactured, kept for sale or bartered."

It is claimed that a dugout, cellar and place does not fall within the specific description of a room, house, building, boat, vehicle, structure or place mentioned in the statute. Giving full effect to the phrase *ejusdem generis* in the construction of this statute and to the rule requiring penal statutes to be strictly construed so as not to be extended to embrace offenses or persons not plainly within their terms, we think there is no merit in the contention. The Century Dictionary and Encyclopedia defines a dugout such as evidently is described in the information as—

"A shelter or rough kind of house excavated in the ground, or more generally in the face of a bluff or bank."

The same authority defines a cave as a "hollow place in the earth." A cave is more often a natural cavity but not necessarily so.

In the case of State v. Sanders, 106 Pac. 1029, the Supreme Court of Kansas held that a dugout or cave thirteen feet long, ten feet wide and seven feet deep covered with a roof and entered through a slanting door made of wood, the dugout being near a residence and used in connection therewith for storing vegetables and vituals, was a building within the meaning of a penal statute. There is nothing in the statute before us to indicate that the Legislature intended to give a restricted meaning to the word "structure" used therein. We think that a dugout or artificial cave is a structure within the meaning of the statute and are of the opinion that it is both a building and a structure,

Complaint is made of the refusal of the court to give plaintiff's cautionary instruction concerning the evidence of an accomplice, if the jury found that one of the witnesses was such.

The evidence shows that defendant lived with his father and mother on a farm owned by his grandmother, about two miles of the town of Langdon. The farm was called the Jim Clark place. In the fall of 1922 Manuel Weaver lived in a house on a twelve-acre farm owned by defendant's grandmother, about a half mile west of where defendant resided. At that time Jack Weaver, a son of Manuel Weaver, lived on a corner of the Jim Clark place, about a half of a mile south of defendant's residence and about a mile from his father's, Manuel Weaver, residence. Jack Weaver moved to his father's house in March, 1923, and has lived there since. Manuel Weaver's house was located about one-half of a mile west of a main, traveled, north and south road. There was also a road running from defendant's home to Manuel Weaver's. About 100 feet west of Manuel Weaver's house was a heavy timbered grove consisting of cotton-wood trees and willows, running many miles north and south and extending west a short distance to the Missouri river. Defendant had a camp on the Missouri River about two miles northwest of where he lived. Manuel Weaver made his living by fishing.

In the fall of 1922, before Jack Weaver had moved to his father's house, some hunters who inquired of the father their way to a certain bar along the Missouri river, were directed by him in a manner so that they would avoid coming in contact with some parts of a still in the brush and which would have taken them much out of their way. However, these hunters took a more direct route and came on to a clearing and there found a gasoline tank, a small copper coil, a barrel full of water, a stove, some old sacks and ground corn. The corn "had been used, apparently soaked out." A windbreak had been made by the use of a binder canvas attached to some poles set in the ground. There were also some holes in the ground. The place where these things were found was about a fourth of a mile northwest of the Manuel Weaver house but not on Weaver's premises.

In the latter part of April, 1923, after Jack Weaver had moved to his father's house, some members of a Sunday School class inquired of Manuel Weaver where they could find mushrooms and he directed them to look south of his house, but they did not confine their search to that part of the woods and found, about 200 to 300 yards northwest of the Manuel Weaver house, where the ground had been dug out. The hole was three or three and one-half feet deep, three or four feet wide, and six or seven feet long. It had some boards over it and an old tarpaulin and these were covered by weeds and sticks and the like. In this cavity were found two fifty gallon barrels full of corn mash, an oil stove, a bucket or a pan or two and

some papers off of yeast packages. One could enter the grove near the Weaver house and walk to the place where these things were found. There were paths in this part of the woods leading to this dugout. The officers destroyed the equipment in this dugout and four or five days after this the officers found another hole in the ground about four feet square and four feet deep covered with some boards or "grain car doors." There was a lantern burning in this room. They found there two barrels of corn mash and covers from yeast packages. The second hole in the ground was from 300 to 400 yards southwest of the first and southwest of the Weaver house.

Jack Weaver testified that he knew of the presence of the still for two years prior to the time it was destroyed by the officers; that he was invited by the defendant to drink liquor at the still and that he did so many times; that he made frequent visits to the still when liquor was being run off but that he never reported this condition of affairs until about six weeks before defendant was arrested, when he told the prosecuting attorney; that he did not "know whether I have turned State's evidence;" that he didn't "exactly let him (the prosecuting attorney) know because I was mad at the defendant because of some difficulty I had with him;" that he had some difficulty with defendant prior to the time he told the prosecuting attorney of the presence of the still but he told the prosecuting attorney about it voluntarily. He testified that he had heard that he was going to be prosecuted and for this reason he expected to be prosecuted after the trial "for being in possession of liquor down there;" that when he told the prosecuting attorney he "didn't know what I was doing;" that he was not out of his right mind on account of the liquor that he drank. In reference to whose still it was, he stated, "I am not sure that it was not mine—it wasn't." He thereafter stated several times that the still was not his. He further testified that he had not "rushed in here and charged this on defendant to get from under this" but that he was not as sure about this as he was about other things he had testified to.

He testified that in February, 1923, he bought five sacks of sugar for the defendant at Slemmons in Langdon; that defendant requested the witness and his father to buy the sugar, stating, "I am a little leery of Slemmons;" that they purchased the sugar for the defendant and delivered it to him at his home in the daytime, unloading it into his garage; that defendant gave them one sack for their trouble; that the sugar was paid for by the defendant and defendant told him to keep the matter of the purchase of this sugar dark and that he did so; that he had no knowledge of what the sugar was to be used for but knew that it could have been used for "innocent purposes." Stemmons testified that Manuel Weaver told him that he was going to can pumpkin with the sugar and that it was not un-

usual for people to buy sugar by the sack at his store. Defendant denied that he had asked the Weavers to purchase the sugar and testified that he knew nothing about it or the presence of the still. The evidence shows that the caves mentioned in the evidence were upon premises owned by defendant's grandmother but not that part occupied by the Weavers.

It is insisted by the defendant that the instruction should have been given because the evidence shows that Jack Weaver was an accomplice. An accomplice is defined to be—

". . . One who is in some way concerned in the commission of a crime, though not as a principal, and this includes all persons who have been concerned in its commission, whether they are considered, in strict legal propriety, as principals in the first or second degree, or merely as accessories before or after the fact." [Cross v. The People, 47 Ill. 152, 158.]

"An accomplice is a person involved either directly or indirectly in the commission of the crime. To render him such, he must in some manner, aid, or assist, or participate in the criminal act, and by that connection he becomes equally involved in guilt with the other party by reason of the criminal transaction." [The People of the State of New York v. Smith, 28 Hun. 626, 627.]

In the latter case it was also held that a purchaser of liquor illegally sold was not an accomplice. [See, also, 33 C. J. 617.] In its brief the State denies that there was any evidence tending to show that Jack Weaver was an accomplice. But we think there was. Jack Weaver was present many times at the "running off" of the liquor. He repeatedly drank the liquor there. The still was near his house for two years and he did not report it to the prosecuting attorney. The State brought out the evidence concerning the buying of the sacks of sugar and showed that defendant was trying to cover up its purchase. All of this evidently was for the purpose of showing that defendant was surreptitiously obtaining supplies for the making of illicit liquor. If he was, the witness, Jack Weaver, in making the purchase and being present at the making of the liquor and drinking it, was aiding and abetting the defendant. In fact, the jury could well infer from the evidence that said Weaver was assisting in the making of the liquor. His testimony concerning his connection with the matter was contradictory and unsatisfactory. While we do not say that the evidence shows as a matter of law that the witness, Jack Weaver, was an accomplice, we feel that there was enough evidence to go to the jury on this point. Defendant was convicted principally on the testimony of Jack Weaver and we think that the court erred in refusing the instruction. [State v. Williams, 266 S. W. 484.]

It is insisted that the court erred in admitting the evidence of the State's witness, Wallace. This witness over defendant's objection

testified that more than a year before the filing of the information he drove his wagon over a cave or hole containing an oil stove, some jugs and two barrels and that it was located northwest of the Weaver house; that a week after the occurrence defendant asked him if it was he who drove "over his (defendant's) cave there in the timber," and the witness answered in the affirmative. It is claimed that under the Statute of Limitations, section 3738, Revised Statutes 1919, defendant could not have been charged with an offense committed at the time of this interview, which conversation, defendant says, was evidence that he was maintaining a nuisance at that time. It is also contended that the evidence merely tended to show the commission of an independent offense. We think the evidence was proper as tending to show the interest or proprietorship that defendant had in the premises and was competent for those purposes, though not strictly confined to the time of the offense for which defendant was prosecuted. [State v. Moon, 283 S. W. 468, 471; 33 C. J. 781, 782, par. 536.] Having shown that defendant owned the cave or dugout at a time prior to the one in question herein, the presumption is that he continued to own it. [King v. Mo. Pac. R. R. Co., 263 S. W. 828, 833; McCray Lumber Co. v. Standard Construction Co., 285 S. W. 104, 107.] A certain discretion is permitted the trial court in matters of this kind and we cannot say that it was abused in this instance.

The judgment is reversed and the cause remanded. *Arnold, J.*, concurs; *Trimble, P. J.*, absent.