Matthias, J.
 

 This is an action in mandamus,
 
 *419
 
 and was instituted in this court by the relator to procure a writ compelling the director of buildings of the city of. Cincinnati to issue a permit for the erection of an addition to the relator’s building, heretofore used as an ice storage plant, and the installation of machinery and equipment necessary to manufacture ice for commercial use. The facts essential to a consideration of the legal questions presented may be very concisely stated.
 

 The building now on relator’s premises was erected in 1923, since which time said building has been used by the relator for the exclusive purpose of storing ice. With the exception of said plant the buildings in the vicinity were residential in character, but when the zoning ordinance was adopted the premises in question were designated as a business “A” district. In 1927 the zoning was changed, and the district classified as a residence “B” district. The application of the relator here in question was filed November 2, 1928. This application was for a permit to make extensive additions to the building and equipment thereof, so as to make of it a commercial ice-manufacturing plant. The application for a permit was refused by the director of buildings, and after hearing upon appeal the zoning board of appeals affirmed the decision of the director of buildings, and refused the permit upon the grounds that' the present building of the relator is a non-conforming use, in that it is a business building in a residence district, and the application and plans filed by the relator provide for an extension of and also a substitution for an existing non-conforming use, in that they contemplate the installation of machinery and' equipment in the present and the pro
 
 *420
 
 posed new building for tbe manufacture of ice, whereas the present building has heretofore been devoted solely to the purpose of storing ice. The board found that the application of the provisions of the Building Code will not result in undue hardship to the relator, and that the modification of the Building Code requested would not be in harmony with the purpose and intent of the provisions of the zoning ordinance, and further found that the use applied for would impair the public health, safety, convenience, prosperity, and general welfare.
 

 The provisions of the zoning ordinance do not in any wise prohibit or restrict any building or structure or use existing at the time of the enactment of the ordinance. On the contrary, the ordinance expressly provides that the same may continue, even though such building structure or use does not conform with the provisions of the ordinance for the district in which it is located. The ordinance further provides that such existing non-conforming use may be hereafter extended throughout any parts of a building which are manifestly arranged or designed for such use at the time of the enactment of said ordinance, but that no building or premises containing a non-conforming use shall be extended unless such extension conforms with the provisions of the ordinance for the district in which it is located. The ordinance authorizes the board of appeals to permit
 
 “a'
 
 substitution for or an extension to nonconforming uses existing at the time of enactment of this ordinance, but not both a substitution and extension, except that in any residence district no change shall be permitted to any use prohibited in
 
 *421
 
 any business district, and in any business district no change shall be permitted to any use prohibited in any industrial
 
 ‘A’
 
 or ‘B’ district.” The ordinance further provides for “the extension of a non-conforming use or buildings upon the lot occupied by such use or buildings at the time of enactment of this ordinance * * * and where such extension is a necessary incident to the existing use, and provided that such extension or extensions shall
 
 *
 
 * * in any case be undertaken within five years of the enactment of this ordinance.”
 

 The relator contends that his application contemplates and provides only for the extension of the building and of the business therein conducted, and not for a substitution of either building or business, the only difference being that instead of a refrigeration equipment to keep blocks of ice therein stored in a solid condition 50 per cent, of the floor space would be used in manufacturing ice.
 

 The primary question presented here is whether the application of the relator contemplates an extension of the same use, or a substituted use, in addition to the extension of its present plant. Under the terms of the ordinance the zoning board of appeals
 
 may
 
 permit a substitution for, or an extension of, a non-conforming use existing at the time of passage of the ordinance, but the board is specifically precluded'from permitting both a substitution and an extension. Evidence was taken by deposition relative to the physical condition of said plant, and the contemplated changes therein, as well as the use to which it has been devoted and the use contemplated by the proposed alterations and additions. Since its erection in 1923 the plant has been
 
 *422
 
 used and operated as a place for the storage of ice, and as a place from which ice was sold, and taken for delivery to customers of the relator. There was maintained in the building during such period only such refrigerating equipment as was essential, by operating automatically and at intervals, to prevent the melting of the ice therein stored. When the relator came to file the application for a permit, the following was therein stated with reference to the use and proposed use of said building: “Now used for storing ice. To be used for manufacturing ice by electric machinery process.” The proposed additions would increase the dimensions of the relator’s building substantially 50 per cent, and the proposed conversion of the plant from a storage to a commercial ice-manufacturing plant would require the installation of a 175-horsepower motor and much other machinery and equipment not at present used therein. The plant as proposed to be constructed would have a manufacturing capacity of 80 tons per day, or about 25,000 per year, whereas the storage capacity of the present plant is but 9,000 tons annually.
 

 It is urged by relator that in the matter of the operation there will be less disturbance by noise of trucks, because, whereas ice is now hauled to and from the plant, ice will hereafter be delivered only from the plant. This claim, however, overlooks the fact of the material extension proposed and the contemplated capacity of .the plant to manufacture substantially three times as much ice as heretofore stored at that place, which would therefore add materially to the traffic in that vicinity, which is always a serious annoyance and hazard in a residential
 
 *423
 
 section, and particularly so here, in view of the fact that within 200 yards of the relator’s building is located a school attended by approximately 750 pupils.
 

 The conclusion is irresistible that the proposed change is not only a very material extension of the plant of the relator, but also that it would result in the addition of a commercial ice-manufacturing plant to the storage plant which relator has heretofore maintained. The proposed plan involves more than the substitution of one business for another; it contemplates the continued maintenance of the business theretofore conducted and the addition thereto of an entirely new and different use, a manufacturing plant, which, if permitted, could operate indefinitely, and, eventually, the right would undoubtedly be claimed to further increase its capacity. The ordinance not only does not authorize, but specifically prohibits, the issuance of the permit applied for by the relator.
 

 The relator contends that, if it be found that the officers of the city of Cincinnati acted properly within the powers granted them under the ordinance, the provisions of said ordinance are unreasonable, arbitrary, and confiscatory, and are therefore violative of Article I, Sections 1 and 19, of the Constitution of Ohio, and of Article NIY of the amendments to the Constitution of the United States. The question of the constitutional validity of ordinances excluding business and trade from residential districts has been definitely decided adversely to the contention of the relator. Decisions of the state courts have been somewhat in conflict upon the question of the constitutionality of such provision, but it
 
 *424
 
 seems altogether unnecessary to discuss or even consider the many decisions of state courts of last resort upon the subject, since the decision of the Supreme Court of the United States in the case of
 
 Village of Euclid
 
 v.
 
 Ambler Realty Co.,
 
 272 U. S., 365, 47 S. Ct., 114, 71 L. Ed., 303, 54 A. L. R., 1016, where the court fully and completely upheld regulations and restrictions such as those involved in the ordinance in the instant case as a valid exercise of the police power, where it does not appear that the restrictions have no real or substantial relation to the public health, safety, morals, or general welfare. Such authority is also supported by the decisions of the Supreme Court of the United States in the following cases, subsequent to the decision of the
 
 Euclid case, supra: Beery
 
 v.
 
 Houghton,
 
 273 U. S., 671, 47 S. Ct., 474, 71 L. Ed., 832;
 
 Terrace Park
 
 v.
 
 Russell Errett,
 
 273 U. S., 710, 47 S. Ct., 100, 71 L. Ed., 852;
 
 Zahn
 
 v.
 
 Board of Public Works,
 
 274 U. S., 325, 47 S. Ct., 594, 71 L. Ed., 1074;
 
 Gorieb
 
 v.
 
 Fox,
 
 274 U. S., 603, 47 S. Ct., 675, 71 L. Ed., 1228, 53 A. L. R., 1210.
 

 The case of
 
 American Wood Products Co.
 
 v.
 
 City of Minneapolis
 
 (D. C.), 21 F. (2d), 440, involved the validity of the provisions of a zoning ordinance, which, while not prohibiting the existing use of a factory in a district zoned as a dwelling district, did prohibit the use of any unimproved property for the purpose of building other factory buildings or additions to factories then existing. The case referred to was a consolidation of four separate actions involving substantially the same question. In each of them it appeared, just as it is claimed in the instant case, that the property of the relator
 
 *425
 
 was far more valuable for industrial than for residence purposes, and therefore that the effect of the ordinance is to seriously depreciate the value of the relator’s property, It was asserted there, as here, that the effect of the enforcement of such ordinance is to deprive the owners of their property without due process of law, and that it constitutes a taking of property for public purposes without just compensation. Indeed that has been the basis of attack upon zoning legislation generally, but it has been disposed of in the cases above referred to and in many other cases therein cited. In his opinion in
 
 American Wood Products Co.
 
 v.
 
 Minneapolis, supra,
 
 Judge Sanborn directed attention to the fact that the constitutionality of the very ordinance involved in that case has been sustained by the Supreme Court of the United States in the case of
 
 Beery
 
 v.
 
 Houghton, supra,
 
 and held that the provisions of said ordinance, forbidding the erection of additions to factories subsequent to the enactment of an ordinance zoning as a residence district the district wherein such factory was located, are not invalid. The reasoning of the Supreme Court of the United States in the
 
 Euclid case, supra,
 
 and other cases above cited, amply sustain and support the validity of the ordinance challenged in this case.
 

 Writ denied.
 

 Marshall, C. J., Kinkade, J ones, Day and Allen, JJ., concur.