## MARBLEHEAD LAND CO. et al. v. CITY OF LOS ANGELES.

District Court, S. D. California, Central Division. September 6, 1929.

No. 13.

M. F. Mitchell and Marvin Osburn, both of Los Angeles, Cal., for plaintiff Land Company.

Lawler & Degnan, of Los Angeles, Cal., for plaintiff Oil Company.

Jess Stephens, City Atty., and Frederick Von Schrader and Herman Mohr, Deputy City Atty., all of Los Angeles, Cal., for defendant.

JAMES, District Judge. This case was heretofore submitted on the evidence introduced by the parties, and the argument, both oral and by brief, as made by counsel. In announcing a decision, no attempt will be made to review, either the evidence or the law as expressed in the decisions. The law has become pretty well settled on the question of police power as it is exerted in ordinances describing zones for various uses within municipalities, including those for general business and residence. Each case, where the validity of such zone restrictions is called into question, must be determined on its own particular facts.

The discussion which follows will be sufficient to explain the decision reached.

As to whether there exists room for debate respecting the restrictive effect of the ordinances in force prior to the adoption, on March 31, 1927, of the ordinance definitely excepting from the residence district of the city that portion of the land of the plaintiffs described in plaintiffs' complaint as the Ambassador addition, seems not especially important. Nor, again, is it important to determine that Ordinance No. 57958, passed on May 24, 1927, excluded the land of plaintiffs, or any part of it. At the time of the adop-

tion of the latter ordinance, the excepting ordinance of March 31, 1927, was still in effect and so remained, unless it should be said that Ordinance No. 57958, by necessary implication, worked a repeal of the permissive ordinance. Ordinance No. 58624, approved August 8, 1927, expressly repealed excepting Ordinance No. 57491; and by its terms definitely included all of the property described in plaintiffs' complaint within the residence zone or district, as did also Ordinance No. 58775, adopted August 27, 1927. There seems to be no room for reasonable debate that the restrictive conditions of the latter ordinances have the effect of preventing the operation of oil wells on the property. At the time of the adoption of the ordinance last referred to, no oil had been developed on the land. It is true that prior to that time plaintiff oil company had entered into a lease with its coplaintiff for the use of the land for the development of oil, and had expended a considerable sum of money in connection with such lease contract, and had erected a drilling rig preparatory to putting down a well for the purpose of discovering whether oil could be there produced.

Before zoning ordinances began to be adopted, which apparently set arbitrary limits to the use to which a property owner might put his property, restrictive ordinances had not gone to the length of determining that property should not be used for nonobjectionable business purposes within particular districts. The exercise of the police power in that direction had mainly gone to restricting the operation of a business which had a natural detrimental effect, often because it was a fire or sanitary menace. When zoning ordinances were first put in effect, many of the bar considered that their existence necessarily must rest upon esthetic considerations, which would not justify the exercise of the power claimed; that they were outside of the field of police regulation. The Supreme Court of the United States, in Euclid v. Ambler Co., 272 U. S. 365, 47 S. Ct. 114, 118, 71 L. Ed. 303, 54 A. L. R. 1016, was called upon to consider the general question of the validity of zoning ordinances. Marking what seemed to be an advanced line in the boundaries of police control, the court in its decision declared:

"Until recent years, urban life was comparatively simple; but, with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities. Regulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for, while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world it is impossible that it should be otherwise. * * *

"The ordinance now under review, and all similar laws and regulations, must find their justification in some aspect of the police power, asserted for the public welfare. The line which in this field separates the legitimate from the illegitimate assumption of power is not capable of precise delimitation. It varies with circumstances and conditions. A regulatory zoning ordinance, which would be clearly valid as applied to the great cities, might be clearly invalid as applied to rural communities."

Zoning ordinances in their general aspect and effect are necessarily discriminating—that is, they discriminate in favor of one area as against another area. No doubt under the decisions it is competent for a municipal legislating body, recognizing the long existence of a certain business in a certain area, to permit that business to continue under regulation and at the same time restrict the further expansion of it into nearby territory which is being used for, and best adapted to, residence purposes. Conditions may have greatly changed since the establishment of a business in a specific locality; just as it is evident conditions have changed at and surrounding the land of plaintiffs since oil wells were drilled on property not far away. The land, it appears from the evidence, is well adapted for subdivision into residence lots, and its value for that purpose is at least the sum of $10,000 per acre. It not only lies in the path of residence growth, but it is already partially surrounded by residential development, some of a very high class, some of a more moderate kind. The section cannot be said to have the character of an industrial district. That to drill for oil over the acre-

age and, if oil were discovered, to continue the production and development thereof, would prove a nuisance to residents on surrounding property, there can be no question. That noise and débris are an incident to every operating oil field is well known. That there are fumes and odors that circulate through the air for a great distance as the result of the operation of oil wells is also a commonly understood fact. The business affected is one which in its very nature interferes with the peace and comfort, and it may well be also the health, of the residents.

It seems not to follow that, because the plaintiff oil company may have made a considerable investment of money prior to the repeal of the permissive ordinance, it thereby obtained a right to proceed to develop the the property as an oil-producing plant, which could not later be taken from it. Once it is said that the restrictive ordinances in question were justified in their subject and terms by the right of police power, then they must be held to operate upon the plaintiffs, regardless of whether they produce damage or not. The case of Dobbins v. Los Angeles, 195 U. S. at page 238, 25 S. Ct. 18, 49 L. Ed. 169, sustains that view. A man might make a very large investment in city lots, which were at the time clear of restrictions, and with the intent to erect a large business thereon, and the next day the city might adopt an ordinance of legal effect as against him, which would so zone his property as to prevent his making the most productive use of it possible. The loss he would suffer he would have to endure for the general good. The contracts of lease made should be assumed to have been entered into with knowledge by the parties of the right of the city to zone the land against business of the character designed to be there established. While that matter cannot have a determining weight in this case, it may be observed that as yet there has been no experimental development work done which establishes that petroleum underlies the land in any quantity whatsoever. Geologists have given an opinion that the property is located along the line of an extensive "fault" at other points on which productive wells have been brought in. So the question, even, as to whether the property could be put to a more valuable use than to be used for residence purposes, is largely speculative.

It is apparent from the conclusions expressed that the decree should be against the plaintiffs. It will be proper to record in the findings that the observation made by the judge of the court on the ground, which was visited in company with counsel for respective parties, furnished no information different from that given by the evidence introduced in court.

It may be that counsel will desire extended findings of fact to be made in order to reduce the size of the record on appeal, if such appeal is taken. It will be appropriate, within ten days after receiving notice of this decision, for counsel for the defendant to submit to the court a draft of the findings of fact and decree, and at the same time mail a copy thereof to counsel for the plaintiffs; counsel for the plaintiffs may, within fifteen days after receiving the copy, forward to the court a draft of such amendments as they may desire to propose, also sending a copy thereof to defendant's counsel.