[L. A. No. 21701.  In Bank.  Aug. 24, 1951.]

COUNTY OF SAN DIEGO, Appellant, v. J. A. McCLURKEN
et al., Respondents.

. James Don Keller, District Attorney, Bertram McLees, Jr., and Duane J. Carnes, Deputy District Attorneys, for Appellant.

Harold W. Kennedy, County Counsel (Los Angeles) and Edward H. Gaylord, Deputy County Counsel, as Amici Curiae on behalf of Appellant.

Bertrand L. Comparet for Respondents.

TRAYNOR, J.—The county of San Diego brought this action to compel the removal of four gasoline storage tanks allegedly erected in violation of a county zoning ordinance. Judgment was entered for defendants, and the county appeals.

Defendants' property is about a mile from the center of Lemon Grove, a suburban area whose center is approximately 8 miles northeast of the business center of the city of San Diego. At the time of the filing of this action this area was predominantly residential with some local business and industry centered around the intersection of Broadway, the principal east-west arterial, and Imperial Boulevard, the principal north-south arterial. Business establishments were located east and west from this intersection along both sides of Broadway and were spottily distributed elsewhere throughout the area. Defendants' land is on the southwest corner of the intersection of Broadway and Massachusetts Avenue, north-south arterial approximately one mile from Imperial Boulevard. The land is rectangular in shape and extends 660 feet south from Broadway and 1,760 feet west from Massachusetts Avenue.

The trial court found that continuously since 1938 defendants have used their property, with the exception of a small part not material to this action, for heavy industrial purposes, including above-ground storage of gasoline and other fuels, storage of paint for industrial painting, wholesale storage and sale of lumber, storage of steel beams and parts of machinery for heavy manufacturing, storage of rock, sand, and gravel, storage of junk and old iron, manufacture of acetylene gas and metal bearings, automobile and truck wrecking, building and rebuilding of heavy machinery, boiler repair shop, commercial planing mill, sandblasting, welding, heavy manufacturing processes using up to 2000 horsepower in the operation of machines, and general heavy construction contracting business. The court also found that defendants have used the entire premises as a unit in carrying out such uses, and that the part of defendants' land where the tanks in question are situated has been used for the foregoing industrial purposes. When defendants undertook this use of their land, the neighboring area was nearly all undeveloped, with virtually no residences.

In 1942 the county adopted Ordinance No. 268 (New Series) as part of a comprehensive zoning plan for the Lemon Grove area. This ordinance divided defendants' property into three districts. A retail business district, C-1, included the area extending south for 150 feet from the south property line on Broadway, thence from Massachusetts to the west edge of defendants' land; a wholesale business section, C-2, included approximately the west two thirds of defendants' land,

running south from the C-1 zone for an additional 330 feet; and a residential district, R-2-A, extending south from the C-1 zone, which included one third of defendants' land.

In 1948 defendants erected a retail gasoline station near the intersection of Broadway and Massachusetts Avenue. The service station was within the area zoned for retail business, which permitted that use. Defendants also erected four tanks to provide storage facilities for the service station. Although the tanks are near the service station, they extend approximately 50 feet within the area zoned for residences. Before 1942 steel beams and trusses had been stored on this corner and there was a preliminary leveling of the land and a service road made thereon. There is no disagreement among any of the witnesses, however, that until the tanks in question were erected there were no permanent structures of any kind on this corner before or after 1942.

The trial court concluded that the tanks were permitted under a provision of the ordinance exempting nonconforming uses existing at the time of its adoption.

Section 17 of Ordinance 371, incorporated by reference in Ordinance 268 (New Series) provides:

"The lawful use of land existing at the time of the passage of this ordinance, although such use does not conform to the provisions hereof, may be continued; if such nonconforming use is discontinued any future use of said land shall be in conformity with the provisions of this ordinance."

Such a provision is ordinarily included in zoning ordinances because of the hardship and doubtful constitutionality of compelling the immediate discontinuance of nonconforming uses. (See *Jones* v. *City of Los Angeles*, 211 Cal. 304 [295 P. 14].) "The object of such a provision is the gradual elimination of the nonconforming use by obsolescence or destruction by fire or the elements, and it has been frequently upheld by the courts." (*Rehfeld* v. *San Francisco*, 218 Cal. 83, 84 [21 P.2d 419].) There is a growing tendency to guard against the indefinite continuance of nonconforming uses by providing for their liquidation within a prescribed period. (See 35 Va.L.Rev. 348, 356; *Standard Oil Co.* v. *City of Tallahassee*, 183 F.2d 410, 413, cert. den., 340 U.S. 892 [71 S.Ct. 208, 95 L.Ed. 647]; *State ex rel. Dema Realty Co.* v. *McDonald*, 168 La. 172 [121 So. 613], cert. den. 280 U.S. 556 [50 S.Ct. 16, 74 L.Ed. 612]; *State ex rel. Dema Realty Co.* v. *Jacoby*, 168 La. 752 [123 So. 314].)

Given the objective of zoning to eliminate nonconforming uses, courts throughout the country generally follow a strict policy against their extension or enlargement.[1]

■ The evidence most favorable to defendants is that in their nonconforming use they utilized fuel tanks that were moved on heavy skid timbers from place to place as they were needed. One tank had a capacity of 1,200 gallons, another 2,300 gallons, and the largest a capacity of 6,000 gallons. Now, however, they have four new tanks with a capacity of 12,000 gallons each, that are 32 feet high and 8 feet in diameter and are permanently located upon a rectangular concrete base 10 feet wide and 54 feet long. In erecting four new tanks double the size of the largest of the old, defendants have not only increased their fuel storage capacity more than five times but have permanently affixed the tanks within the area zoned for residences. Such a formidable expansion can hardly be viewed as a mere continuance of the nonconforming use consisting of the intermittent storage of

[1]*Rehfeld* v. *San Francisco*, 218 Cal. 83, 85 [21 P.2d 419]; *Burke* v. *City of Los Angeles*, 68 Cal.App.2d 189, 191 [156 P.2d 28]; *Yuba City* v. *Cherniavsky*, 117 Cal.App. 568, 573 [4 P.2d 299]; *Wilson* v. *Edgar*, 64 Cal.App. 654, 657 [222 P. 623]; *De Felice* v. *East Haven*, 130 Conn. 156 [32 A.2d 635, 147 A.L.R. 161]; *Piccolo* v. *West Haven*, 120 Conn. 449 [181 A. 615, 617]; *Thayer* v. *Board of Appeals*, 114 Conn. 15 [157 A. 273, 276]; *Ware* v. *Wichita*, 118 Kan. 265 [234 P. 978]; *Goodrich* v. *Selligman*, 298 Ky. 863 [183 S.W.2d 625, 627]; *Dorman* v. *Baltimore*, 187 Md. 678 [51 A.2d 658, 661]; *Colati* v. *Jirout*, 186 Md. 652 [47 A.2d 613, 615-616]; *Beyer* v. *Mayor and City of Baltimore*, 182 Md. 444 [34 A.2d 765, 769]; *Connors* v. *Town of Burlington* (1950), Mass. [91 N.E.2d 212, 213]; *Inspector of Bldgs. of Burlington* v. *Murphy*, 320 Mass. 207 [68 N.E.2d 918, 919]; *Town of Burlington* v. *Dunn*, 318 Mass. 216 [61 N.E.2d 243, 247, 168 A.L.R. 1181]; *Town of Marblehead* v. *Rosenthal*, 316 Mass. 124 [55 N.E.2d 13]; *Town of Lexington* v. *Bean*, 272 Mass. 547 [172 N.E. 867, 870]; *Cole* v. *City of Battle Creek*, 298 Mich. 98 [298 N.W. 466, 468]; *Austin* v. *Older*, 283 Mich. 667 [278 N.W. 727, 729]; *Women's Christian Ass'n. of Kansas City* v. *Brown*, 354 Mo. 700 [190 S.W.2d 900, 906]; *In re Botz*, 236 Mo.App. 566 [159 S.W.2d 367, 371-373]; *Lynch* v. *Borough of Hillsdale*, 136 N.J.L. 129 [54 A.2d 723, 725-726]; *Albright* v. *Johnson*, 135 N.J.L. 70 [50 A.2d 399]; *Burmore Co.* v. *Smith*, 124 N.J.L. 541 [12 A.2d 353, 356]; *Home Fuel Oil Co.* v. *Glen Rock*, 118 N.J.L. 340 [192 A. 516, 518]; *De Vito* v. *Pearsall*, 115 N.J.L. 323 [180 A. 202]; *Conaway* v. *Atlantic City*, 107 N.J.L. 404 [154 A. 6]; *Village of Ossining* v. *Meredith*, 73 N.Y.S.2d 897; *People* v. *Giorgi*, 16 N.Y.S.2d 923; *Pisicchio* v. *Board of Appeals*, 165 Misc. 156 [300 N.Y.S. 368, 369]; *State ex rel. City Ice & Fuel Co.* v. *Stegner*, 120 Ohio St. 418 [166 N.E. 226, 227, 64 A.L.R. 916]; *Appeal of Kiddy*, 294 Pa. 209 [143 A. 909]; *Appeal of Yocom*, 142 Pa. Super. 165 [15 A.2d 687, 689-690]; *Meserolo* v. *Board of Adjustment, City of Dallas*, (Tex. Civ. App.) 172 S.W.2d 528, 530-531; *Benjamin* v. *Lietz*, ——Utah—— [211 P.2d 449, 451]; see 147 A.L.R. 167; 8 McQuillin, Municipal Corporations, 3d ed. 1950, § 25.183, pp. 366-367.

lumber and scrap metal, preliminary grading, steel beam storage, or even the use of movable tanks "all over the property, first one spot and then another" that may have occurred in the area in question. ■ Even if the new tanks were used to supply power for the original industrial use, they would constitute an unwarranted enlargement of that nonconforming use. (See *Rehfeld* v. *San Francisco; Yuba City* v. *Cherniavsky; Piccolo* v. *West Haven; De Felice* v. *East Haven; Thayer* v. *Board of Appeals; Ware* v. *Wichita; Colati* v. *Jirout; Inspector of Bldgs. of Burlington* v. *Murphy; Town of Marblehead* v. *Rosenthal; Town of Burlington* v. *Dunn; Austin* v. *Older; Women's Christian Ass'n. of Kansas City* v. *Brown; In re Botz; Home Fuel Oil Co.* v. *Glen Rock; DeVito* v. *Pearsall; Pisicchio* v. *Board of Appeals; People* v. *Giorgi; State ex. rel. City Ice & Fuel Co.* v. *Stegner; Appeal of Yocom; supra* note 1.)

■ The new tanks involve not merely an expansion of a nonconforming use but a new nonconforming use. The permitted use was for the storage of fuels to be consumed in supplying power as an incident to the industrial use; the new tanks are used as an incident to the service station use.

■ The continuance of a nonconforming use "is a continuance of the same use and not some other kind of use." (*Kensington Realty Holding Corp.* v. *Jersey City*, 118 N.J.L. 114 [191 A. 787, 788] ; *Simone* v. *Peters*, 135 N.J.L. 495 [53 A.2d 315] ; *Home Fuel Oil Co.* v. *Glen Rock; Town of Lexington* v. *Bean; In re Botz; Women's Christian Ass'n. of Kansas City* v. *Brown; Appeal of Yocom; supra*, note 1.) Defendants never conducted a service station on their premises until 1948, six years after the adoption of the ordinance. Although the service station is permitted in its location, the tanks are not permitted in the residence zone where defendants erected them. ■ No one may erect such tanks in this residential district, and it would be an unwarranted discrimination in favor of defendants to hold that they may do so. (*Rehfeld* v. *San Francisco, supra*, 218 Cal. 83, 85; *Pisicchio* v. *Board of Appeals*, 165 Misc. 156 [300 N.Y.S. 368, 369-370].)

■ Even if it be assumed that the tanks did not involve a new nonconforming use of the land, their construction was prohibited by the second paragraph of section 17 of Ordinance 371, which provides:

"The lawful use of a building existing at the time of the passage of this ordinance may be continued, although such

use does not conform with the provisions hereof; such use may be extended throughout the building provided no structural alterations, except those required by law or ordinance, are made therein. If no structural alterations are made, a non-conforming use of a building may be changed to another non-conforming use of the same or more restricted classifications."

A "building" is defined in section 1 of ordinance 371 as "a structure having a roof supported by columns or walls." "Structure" is defined as "anything constructed or erected and use of which requires more or less permanent location on the ground or attachment to something having a permanent location on the ground." It has been held that "building" includes a water tank (*State* v. *Ornelas,* 42 N.M. 17 [74 P.2d 723, 725]); a dugout or artificial cave (*State* v. *Clark,* 221 Mo.App. 893 [288 S.W. 77]); a silo (*Bush* v. *Norman* (Mo.App.) 199 S.W. 721); a 35-foot steel tower and 60-barrel steel storage tank supported thereby (*Griffin* v. *Holland,* 191 Okla. 417 [131 P.2d 113]); an iron fence (*Swasey* v. *County of Shasta,* 141 Cal. 392, 394 [74 P. 1031]); a sand-hopper (*Wilbur* v. *City of Newton,* 302 Mass. 38 [18 N.E.2d 365, 368]; a billboard (*Goodrich* v. *Selligman, supra,* note 1; for numerous other illustrations see 12 C.J.S. 382.) Thus, there can be no doubt that the four new tanks are "buildings" within the meaning of the ordinance. Although the prohibition of structural alterations does not preclude ordinary routine repair and maintenance of existing buildings (see 58 Am.Jur. Zoning, § 156, p. 1026) it does preclude the erection of new buildings. If an old building cannot be enlarged, *a fortiori* a new building cannot be built. (*Rehfeld* v. *San Francisco; Yuba City* v. *Cherniavsky; Piccolo* v. *West Haven; Goodrich* v. *Selligman; Colati* v. *Jirout; Connors* v. *Town of Burlington; Inspector of Bldgs. of Burlington* v. *Murphy; Cole* v. *Battle Creek; Women's Christian Ass'n. of Kansas City* v. *Brown; DeVito* v. *Pearsall; Benjamin* v. *Lietz; supra,* note 1; see 8 McQuillin, Municipal Corporations, 3d ed. 1950, § 25. 205, p. 393.)

Defendants contend that they would have constructed all necessary facilities at the beginning to complete the full industrial development of their property had they had capital enough and that since they "had to finish the plant as they could earn it, one building at a time," they gained a vested right to continue the development of their land until its full

industrial use had been reached. ██ The purpose of the landowner in purchasing the property must yield to the public interest in the enforcement of a comprehensive zoning plan. (*Wilkins* v. *City of San Bernardino,* 29 Cal.2d 332, 337 [171 P.2d 542]; *Acker* v. *Baldwin,* 18 Cal.2d 341, 344 [115 P.2d 455]; *Sunny Slope Water Co.* v. *City of Pasadena,* 1 Cal.2d 87, 93-94 [33 P.2d 672]; *cf. Skalko* v. *City of Sunnyvale,* 14 Cal.2d 213, 215 [93 P.2d 93].) ██ The intention to expand the business in the future does not give defendants the right to expand a nonconforming use. (*Town of Billerica* v. *Quinn,* 320 Mass. 687 [71 N.E.2d 235, 236]; *Chayt* v. *Board of Zoning Appeals of Baltimore City,* 17 Md. 426 [9 A.2d 747, 750]; *Appeal of Kiddy, supra,* note 1.) The ordinance has made allowance for the continuance of nonconforming uses existent in 1942; it does not permit the enlargement of such uses as the owners find expansion desirable. It is immaterial that a property owner in an area zoned for residential purposes contemplated the maximum commercial utilization of his property previous to the zoning ordinance. (*Sunny Slope Water Co.* v. *City of Pasadena,* 1 Cal.2d 87, 95 [33 P.2d 672]; *O'Rourke* v. *Teeters,* 63 Cal.App.2d 349, 352 [146 P.2d 983]; *Marblehead Land Co.* v. *City of Los Angeles,* 36 F.2d 242, 244; 47 F.2d 528, 534, cert. den. 284 U.S. 634 [52 S.Ct. 18, 76 L.Ed. 540]; *Ware* v. *City of Wichita,* 113 Kan. 153 [214 P. 99]; *Spector* v. *Building Inspector of Milton,* 250 Mass. 63 [145 N.E. 265]; *Chayt* v. *Board of Zoning Appeals of Baltimore City, supra.*) Although defendants are confined in their nonconforming use to the activities carried on at the time their property was zoned, they enjoy a favored position compared to those who purchased property for a nonconforming use and were prevented from using it at all for that purpose because their property was zoned before they could establish such a use.

Defendants rely on *In re Smith,* 143 Cal. 368 [77 P. 180] and *Dobbins* v. *Los Angeles,* 195 U.S. 223, 224 [25 S.Ct. 18, 49 L.Ed. 169]. In the Smith case the gas works had been erected before the passage of the ordinance. It exemplifies the rule that a lawful use existing at the time a zoning ordinance becomes effective cannot be prohibited when it is not a public nuisance. In the Dobbins case the owner undertook construction of a gas works in a permitted area and expended some $2,500 in erecting the foundation before a zoning ordinance was passed prohibiting gas works in that district.

■ If an owner has legally undertaken the construction of a building before the effective date of a zoning ordinance, he may complete the building and use it for the purpose designed after the effective date of the ordinance. (*City of Coldwater* v. *Williams Oil Co.*, 288 Mich. 140 [284 N.W. 675] ; *Best & Co.* v. *Incorporated Village of Garden City*, 286 N.Y.S. 980, aff'd. 273 N.Y. 564 [7 N.E.2d 694].) Protection of an undertaking involving the investment of capital, the purchase of equipment, and the employment of workers, is akin to protection of a nonconforming use existing at the time that zoning restrictions become effective. ■ The same principle underlies the rule that a permittee who has expended substantial sums under a permit cannot be deprived by a subsequent zoning ordinance of the right to complete construction and to use the premises as authorized by the permit. (*Trans-Oceanic Oil Corp.* v. *Santa Barbara*, 85 Cal.App.2d 776 [194 P.2d 148] ; *Sandenburgh* v. *Michigamme Oil Co.*, 249 Mich. 372 [228 N.W. 707] ; *Atlantic Broadcasting Co.* v. *Wayne Tp.*, 109 N.J.L. 442 [162 A. 631] ; *Nassau-Fulton Realty Corp.* v. *Schlimm*, 67 N.Y.S.2d 501; *People* v. *Bales*, 224 App.Div. 87 [229 N.Y.S. 550].)

Defendants contend that they are being discriminated against on the ground that neighboring owners were granted variances and that over half the lands within a radius of the intersection of Broadway and Massachusetts Avenue were being used for heavy industrial purposes. There was a sharp conflict in the evidence as to the extent and nature of the other nonconforming uses in this area. The trial court made no finding on this issue, and the evidence does not establish unjust discrimination as a matter of law. No zonng ordinance can classify districts with perfect justice. Since cases of unusual hardship may require variances, zoning authorities are usually given power to grant them. ■ The fact that variances may have been granted to some owners and denied to others, however, does not establish unreasonable discrimination. ■ The granting or denial of variances rests largely in the discretion of the body designated by the zoning ordinance for that purpose, and a denial of a variance will not be disturbed in the absence of a clear showing of abuse of discretion. (*Rubin* v. *Board of Directors*, 16 Cal.2d 119 [104 P.2d 1041] ; *Otis* v. *City of Los Angeles*, 52 Cal.App.2d 605, 613 [126 P.2d 954] ; *Larkin Co., Inc.* v. *Schwab*, 242 N.Y. 330, 336 [151 N.E. 637, 639]. As to the degree of discretion vested in such bodies, see *Lockard* v. *Los Angeles*, 33 Cal.2d

453, 461 [202 P.2d 38, 7 A.L.R.2d 990] ; *Acker* v. *Baldwin,* 18 Cal.2d 341, 344 [115 P.2d 455].)

Judgment reversed.

Gibson, C. J., Edmonds, J., and Spence, J., concurred.

SCHAUER, J.—I dissent. The factual issues in this case, upon substantially conflicting evidence, were resolved adversely to the plaintiff by the trial court. Instead of viewing the case favorably to sustaining the judgment on contested issues of fact, the majority apply a directly contrary view. It is further my view that the opinion of the District Court of Appeal, Fourth Appellate District, prepared by Presiding Justice Barnard, with Justice Griffin concurring (reported in 99 A.C.A. 957 [222 P.2d 688]), correctly and soundly disposes of the issues presented.

For the reasons stated I would affirm the judgment of the trial court.

Shenk, J., concurred.

CARTER, J.—I dissent.

The majority opinion overrides the findings of the trial court based on conflicting evidence and thus arrives at the conclusion that defendants were not continuing the nonconforming use of their property after the passage of the zoning ordinance.

The trial court found that in 1938, before any zoning ordinance was applicable to defendants' property they used it ''for heavy industrial purposes, including, among others, the following : automobile and motor-truck wrecking and rebuilding; heavy machinery wrecking and rebuilding; boiler shops; *gasoline and oil storage, above ground*; junk yards; lumber storage and wood-working, such storage being carried on in the open and without enclosure by walls; the manufacture, storage and use of acetylene gas; sandblasting; both gas and electric welding; storage of explosives; storage, and use in manufacturing processes, of paints, oil and shellac; the operation of a planing mill; storage of rock, sand and gravel; storage of old iron in large quantities; operation of large machine shops, using heavy machinery; storage and repair of heavy construction machinery; sale of machinery of various kinds. That said Defendants have made use of *all* of the land so owned by them . . . as a unit, to be used in its entirety for the convenient and efficient operation thereon of the said heavy industrial purposes and uses.'' (Italics added.) It was spe-

cifically found, with reference to the four storage tanks here involved, that: "the portion of said Defendants' said land upon which said tanks for the storage of gasoline and other fuels were erected and are now situated is *within the portion of* said lands which said Defendants have, continuously since the year 1938, used for heavy industrial purposes, as aforesaid." (Italics added.)

The evidence adequately supports those findings, establishing that prior to 1942, and before the enactment of the zoning ordinance, defendants conducted an extensive industrial business on *all* their property, manufacturing heavy machinery, constructing heavy equipment, storing, selling and using explosives, gasoline, butane, lumber, machinery, etc. For illustration, J. A. McClurken, one of the defendants, testified: "Q. Now, in this matter of the storage of fuel and lumber and paint and explosives and so on, was that restricted strictly to any one particular portion of the premises? A. It was spread over the entire property. That is what the property was purchased for and that is what it was used for constantly from that day till this. . . . Q. Now, with regard to the fuel storage there for the use of gasoline or Diesel or butane operated engines, during what portion of the time did you have an above-ground fuel storage? Was that prior to 1942? A. Oh, yes, we have always had our fuel above ground. . . . Q. When you say tanks off of trucks do you mean the little 15 or 20 gallon tanks that the trucks, in the engine, gets its fuel from? A. No, we have one tank that holds 1200 gallons; another one that holds 2300 gallons; another one I think holds 6000 gallons. They have not all been full, as a rule, at one time, but we have used them according to the volume of work and according to the needs of the equipment, or according to our gasoline usage. Sometimes they would all be full; sometimes one of them would be full, and it would vary according to the actual gallonage that we were using. . . . Q. Now, what part of the premises did you have above-ground fuel storage on? Was it limited permanently and definitely to just one tank, or where? A. Oh, no, we had it all over the property; first one spot and then another; wherever it was most convenient to have it." With reference to any change in the use of the property he said: "Q. Now, getting back to the various types of manufacturing and storage work conducted on your premises, has there been an(y) substantial change in the nature of the use of your premises from what it was before 1942, as you have described it, down to the present time?

Have you changed your use? A. No, sir, *our operations are identical.*" (Italics added.) In other words, defendants were engaged in a highly diversified business which embraced selling, manufacturing, storing and repairing a wide variety of things, and to conduct that business, maintained all sorts of equipment, huge buildings and tanks. That business is the same now as it was prior to 1942. The trial court, taking all of these factors into consideration, concluded that the use of the gasoline tanks here involved did not constitute a substantial change in the use of the property. Certainly that cannot be said to be an *unreasonable* conclusion, yet the majority states that it is. By a picayunish selection of trivialities, it asserts there was a change of use because the tanks are larger than those used formerly and that the fuels stored are to be used for sale instead of defendants' use in manufacturing. There is evidence that fuel was sold before 1942, but, in any event, the change is not substantial considering the extensive and diversified character of defendants' operations. The ordinance exempts *uses* existing at the time of its passage. Here the evidence shows that the *use* of defendants' property is the same. They are still operating the same business as before the adoption of the ordinance.

There is no sound basis for distinction between this case and *Dobbins* v. *Los Angeles,* 195 U.S. 223 [25 S.Ct. 18, 49 L.Ed. 169], where the court held invalid an ordinance barring gas works where the property owner had *partially* erected the plant when the ordinance was passed. The court there said (p. 239) : "Being the owner of the land and having partially erected the works the plaintiff in error had acquired property rights and was entitled to protection against unconstitutional encroachments which would have the effect to deprive her of her property without due process of law." If the right to complete a *partially* built structure is protected, certainly there is a constitutionally protected right to continue to operate the business exactly the same as before (as the evidence shows). Fuel storage tanks were previously maintained on the property. There is no more reason for preventing their enlargement than there would be for stopping the completion of a gas plant. In fact, this is a stronger case, for here the industrial business operations are being continued. The true test has been stated: "The fact that improved or more efficient instrumentalities are utilized in pursuit of the use does not exclude it from the category of an 'existing use' within a town zoning ordinance permitting the continuance of nonconforming existing uses, provided the instrumentalities are

ordinarily and reasonably adapted to make the use available to the owner and the *original nature and purpose of the undertaking remain unchanged.* . . . It is a definitely settled proposition of law that the 'continuance of a non-conforming use' existing at the time of the adoption of the zoning ordinance is a continuance of the same use and not some other kind of use. In determining whether a non-conforming use was the same before and after passage of a zoning ordinance, so as to be permissible, each case must stand on its own facts. . . . In a recent New York case where a lot in an area zoned for residential purposes was subject to a non-conforming use of storage of poles, cable and pipe, the non-conforming use related to storage and the storage of any other object was a valid continuation of such non-conforming use unless the thing stored was vastly different and in itself created new problems, in which case it could be considered a change of use.'' (Emphasis added.) (Yokley, Zoning Law & Practice, p. 254.) (See, also, *Royal Baking Co.* v. *Oklahoma City,* 182 Okla. 45 [75 P.2d 1105] ; *Borough of Cheswick* v. *Bechman,* 352 Pa. 79 [42 A.2d 60] ; *President & Trustees of Ossining* v. *Meredith,* 73 N.Y.S.2d 897; *McIvor* v. *Mercer-Fraser Co.,* 76 Cal.App.2d 247 [172 P.2d 758].)

Reference is made to the portion of the ordinance prohibiting structural changes in preexisting buildings. Plainly, that provision deals with the change in use of the property which would follow from a structural alteration, that is, for example, if a residence was so changed that it could be used as a factory. The essential factor is still the nature of the use of the property. Has that been so altered or extended that the exemption for nonconforming uses does not apply? If not, as is the case here, there is no violation of the zoning law.

Finally, it is said that the evidence is highly conflicting on whether the ordinance discriminates against defendants, but that there is no finding on the subject, and, therefore, defendants cannot prevail. There is ample evidence that the immediate neighborhood around defendants' property is thickly sprinkled with heavy industry and businesses such as the storage and sale of fuel. The findings must be liberally construed to support the judgment. So construed, there is a sufficient finding on the subject. Defendants, in their answer, denied that they had violated the ordinance and that the ordinance applied to their property. That denial was found to be true. They alleged that their use was ''in keeping with permits'' granted by the county. That was found to be true.

It may be at least implied from such findings that the ordinance unlawfully discriminates against them, and the judgment might well be upheld on this ground. However, there is no need of even considering the question of discrimination in the enforcement of the ordinance, as the evidence overwhelmingly supports the finding that defendants' so-called nonconforming uses are a mere continuation of the uses to which their property had been devoted before the adoption of the ordinance and are therefore exempted by its provisions. I am in full accord with the views expressed in the opinion prepared by Mr. Presiding Justice Barnard of the District Court of Appeal, Fourth Appellate District, which affirmed the judgment in this case. (See 99 A.C.A. 957 [222 P.2d 688].) I would therefore affirm the judgment.